## SOUTHERN RAILWAY COMPANY *v.* REID.

### ERROR TO THE SUPREME COURT OF THE STATE OF NORTH CAROLINA.

No. 487. Argued December 6, 1911.—Decided January 9, 1912.

There are three degrees to which the State exercises power over commerce. First exclusively; second, in the absence of legislation by Congress, until Congress does act; third, where Congress having legislated, the power of the State cannot operate at all.
Although when Congress is silent, the State may legislate in aid of, or

without burdening, interstate commerce, there may at any time be Federal exertion of authority which takes that power from the State.

Although where Congress and the State have concurrent power, that of the State is superseded when the power of Congress is exercised, the action of Congress must be specific in order to be paramount. *Missouri Pacific Ry. Co.* v. *Larabee Mills*, 211 U. S. 612.

By the specific provisions of the act to regulate commerce, as amended, Congress has taken control of rate making and charging for interstate shipments, and in that respect such provisions supersede state statutes on the same subject; and so *held* that a statute of North Carolina requiring common carriers to transport freight as soon as received to interstate points under penalties for failure, conflicts with the requirement of § 2 of the Hepburn Act of July 29, 1906, c. 3591, 34 Stat. 584, forbidding transportation until rates had been fixed and published, and is therefore unenforceable.

As between the Federal Government and the States one authority must be paramount and when it speaks the other must be silent.

No essential power is taken from the States in preserving the balances of the Constitution and giving to Congress the power which belongs to it.

Any middle ground on which state authority might still be preserved after Congress has spoken in regard to interstate commerce is passed when the state regulation burdens such commerce, and the imposition of penalties for failure to receive and transport freight does impose a burden.

*Quære* whether conceding that a State may impose a penalty does not concede the State to be competent to determine the amount.

153 N. Car. 490, reversed.

THE facts, which involve the validity of a statute of North Carolina affecting common carriers, are stated in the opinion.

*Mr. Alfred P. Thom,* with whom *Mr. John K. Graves* was on the brief, for plaintiff in error in this case and in No. 80 argued simultaneously herewith (see p. 444, *post*):

The statute contravenes the commerce clause of the Constitution because it seeks to regulate, and if enforced, will impose a burden upon, interstate commerce. *Gibbons* v. *Ogden,* 9 Wheat. 1, 189, 210; *Gloucester Ferry Co.* v.

*Pennsylvania*, 114 U. S. 204; *Atl. Coast Line R. R. Co.* v. *Riverside Mills*, 219 U. S. 186. See also cases showing where the line is to be drawn in which state statutes were upheld: *West. Un. Tel. Co.* v. *James*, 162 U. S. 650; *Richmond &c. R. R. Co.* v. *Patterson Co.*, 169 U. S. 311; *Atl. Coast Line R. R. Co.* v. *Mazursky*, 216 U. S. 122; *West. Un. Tel. Co.* v. *Commercial Milling Co.*, 218 U. S. 406; *West. Un. Tel. Co.* v. *Crovo*, 220 U. S. 364; and in which state statutes, or orders of state commissions were condemned: *West. Un. Tel. Co.* v. *Pendleton*, 122 U. S. 347; *Central of Geo. Ry. Co.* v. *Murphey*, 196 U. S. 194; *McNeill* v. *Southern Ry. Co.*, 202 U. S. 543; *Houston &c. R. R. Co.* v. *Mayes*, 201 U. S. 321; *St. Louis &c. R. R. Co.* v. *Arkansas*, 217 U. S. 136.

The question is whether the statute is constitutional as applied to interstate commerce, not whether the imposition of the penalties in these particular cases might have been constitutionally authorized.

One upon whom a penalty has been imposed under the provisions of a statute has an interest which has suffered, and is entitled to challenge the validity of the statute as applied to all cases within its operation. *United States* v. *Reese*, 92 U. S. 214, 222.

The statute is not merely in aid of a common law duty, but is regulating interstate commerce. It rigidly requires the carrier to receive freight whenever tendered. No exception is made for any cause or under any circumstances whatever. *Alsop* v. *Express Co.*, 104 N. Car. 278; *Garrison* v. *Southern Ry. Co.*, 150 N. Car. 575; *Wampum Cotton Mills* v. *Carolina &c. R. R. Co.*, 150 N. Car. 608; *Burlington Lumber Co.* v. *Southern Railway Co.*, 152 N. Car. 70.

The penalties began to accrue immediately upon the refusal to receive; not from the time the rates could be ascertained in the exercise of due diligence.

No duty at common law rests upon a carrier, in the

absence of contract or custom, either to receive freight at or deliver to an industrial siding or non-agency station. Hutchinson on Carriers (3d ed.), § 122; *Louisville &c. R. R. Co.* v. *Flanagan,* 113 Indiana, 488; *Charnock* v. *Tex. & Pac. R. R. Co.,* 194 U. S. 436; *Kellogg* v. *Railway Co.,* 100 N. Car. 158; *Land* v. *Railway Co.,* 104 N. Car. 48.

If there is no duty, in the absence of contract or custom, to receive freight tendered at a non-agency station, it follows that no common law duty rests on the carrier to deliver at or to accept shipments for delivery at such a point.

The statute, as construed by the Supreme Court of the State, imposes a penalty upon the carrier for refusing to receive for transportation, and issue a bill of lading for, a shipment which it is forbidden, on account of no rate having been filed with the Interstate Commerce Commission, from transporting in interstate commerce.

The North Carolina statute imposes a penalty for the refusal to receive freight "whenever tendered" and imposes a penalty of $50 for the first day's delay, and the same amount for each succeeding day *ad infinitum.* It is supplemented by another statute imposing heavy penalties in case the railroad company shall not promptly start and continue to transport the freight after it is received. As construed by the North Carolina court, the inability of the railroad company to deliver in no way excuses it from the necessity of receiving for transportation.

Being placed in this situation it must for its self-protection undertake at all hazards to avoid the risk of the accrual of penalties under the statute, regardless of the consequences to the movement of interstate and other commerce. This being true, any relief which may be thereafter granted by the court from a sense of justice or clemency cannot retroact so as to nullify the burden which has already been placed upon interstate commerce. If this

is a government of laws and not of men, as has been frequently declared by this court, the statute cannot be saved from invalidity by the exercise or by the promised exercise by the judicial department of the State of a power analogous to the pardoning power vested in the executive.

The statute is unconstitutional in that it conflicts with acts of Congress regulating interstate commerce.

No 80 involves matters which took place after the Hepburn Act of June 29, 1906, was passed and approved, and after the national policy had therefore been expressly declared, but before it became effective. No. 487 involves matters which took place after the Hepburn Act became effective.

By the enactment of the Commerce Act, Congress has actually assumed control of the matter of the receipt of goods tendered for interstate transportation.

Conflict and confusion necessarily result from the administration of the state law by the state courts and the Federal law by the Federal tribunals as to the same subject: *Texas &c. R. R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 440; *Balt. & Ohio R. R. Co.* v. *Pitcairn Coal Co.*, 215 U. S. 481; and see § 23 of the act, which was not altered by the Hepburn Act.

*Mo. Pac. Ry. Co.* v. *Larabee Mills*, 211 U. S. 612, does not affect this case.

After the passage of the Hepburn Act, under the new regulations of that act, Congress expressly took complete control of the business of interstate transportation. It declares that transportation shall be furnished "upon reasonable request therefor," while the state statute requires the carrier to receive freight "whenever tendered."

Even if the statute should be construed to impose the same affirmative duties upon the carrier as are prescribed by Congress in the "reasonable request" clause, the state statute would be invalid as invading the field of which Congress has taken control, and that, too, in a matter

of national scope and importance, admitting of but one uniform system of regulation. *Cooley* v. *Board of Wardens,* 12 How. 299; *County of Mobile* v. *Kimball,* 102 U. S. 691; *Wabash Railway Co.* v. *Illinois,* 108 U. S. 573; *McLean* v. *Denver &c. R. R. Co.,* 203 U. S. 38; *Oklahoma* v. *Kansas Gas Co.,* 221 U. S. 229.

Under § 2 of the Hepburn Act the carrier is expressly forbidden to engage in the transportation, including the receipt, of property unless it has filed and published its rates as required in the act. In the face of this prohibition by Congress, the State cannot validly declare that interstate freight shall be received "whenever tendered," irrespective of whether the carrier has or has not complied with the condition precedent expressly imposed by Congress. Congress says to the carrier which has not published and filed the rates: "Thou shalt not receive"; the State commands: "Thou shalt receive." Which shall the carrier obey? See the provisions of the Carmack Amendment, added to § 20 by the Hepburn Act of 1906, in which Congress in express words regulates the duty of the carrier in the matter of issuing receipts or bills of lading for freight tendered for interstate transportation, and the operation of the state law is thereby excluded.

*Mr. Plummer Stewart* and *Mr. Jno. A. McRae* for defendants in error in this case and in No. 80 argued simultaneously herewith (see p. 444, *post*):

Section 2131 of the North Carolina Revisal of 1905, penalizing common carriers for refusing to accept freight for shipment, is in the aid of commerce and not a restraint upon it, and is, therefore, a valid exercise of the State's power. *Atl. Coast Line* v. *Mazursky,* 216 U. S. 122; *West. Un. Tel. Co.* v. *James,* 162 U. S. 650.

State enactments of the following nature have been declared valid by this court:

Requiring engineers to be examined with respect to

their ability to distinguish color (*R. R. Co.* v. *Alabama,* 128 U. S. 96); requiring telegraph companies to receive dispatches, to transmit and deliver them with due diligence, as applied to messages outside of the State (*Telegraph Co.* v. *James, supra*); forbidding running freight trains on Sunday (*Hennington* v. *Georgia,* 163 U. S. 299); requiring railway companies to fix their rates annually for the transmission of passengers and freight, and to post a printed copy at stations (*Railroad Co.* v. *Fuller,* 17 Wall. 560); regulating the heating of passenger cars and directing guards and guard posts to be placed on bridges and trestles (*Railroad Co.* v. *New York,* 165 U. S. 628).

Interstate shippers will get better service with statutes like the one in question than without.

Freight must be shipped or started on its way before it becomes interstate commerce. *Coe* v. *Errol,* 116 U. S. 517; *The Daniel Ball,* 10 Wall. 565; *Match Co.* v. *Ontonagon,* 188 U. S. 94.

The statute is not unconstitutional in that it conflicts with the act of Congress regulating interstate commerce.

The defendant could have received the freight in question for shipment before the rate of freight to be charged for transportation had been filed with the Interstate Commerce Commission, published according to law, etc., without having been guilty of a misdemeanor.

Under § 6 of the act the rates are to be filed when they have been established. Under the agreed facts in this case the joint rates between the points in question had not been established.

The question of whether the carrier would have been liable for negligence of the connecting road, had it issued the bill of lading before a joint rate had been established, is not in this case or properly before the court.

When the carrier refused to receive the freight in question for shipment, it did not set up the excuse that it would be liable for any negligence of the connecting car-

rier, but solely the objection that it did not know the freight rates. At this late day, it cannot be allowed to come in and substitute some other reason or excuse for its failure to perform its common law duty. When the destination is on the line of a receiving carrier, it is the duty of such carrier to receive, transport and deliver within a reasonable time and for reasonable compensation; when the destination is upon the line of the connecting carrier, it is the duty of the initial carrier to receive, transport and deliver to the connecting carrier. The bill of lading under which the shipment in question was carried recognized this.

In No. 487 the shipper did not demand to be allowed to prepay the freight—she only offered to do so. The freight could have been accepted for shipment and shipped and the final carrier could have collected the charges by a sale of the property, if necessary for the purpose. The public would be inconvenienced by any such rules of conducting its business as the common carrier insists upon in this particular case.

MR. JUSTICE McKENNA delivered the opinion of the court.

The question in the case is the validity of an act of the State of North Carolina which requires the agents and officers of railroads and other transportation companies to receive freight for transportation whenever tendered at a regular station, and every loaded car tendered at a side track or any warehouse connected with the railroad by a siding, and forward the same by a route selected by the person tendering the same, under penalty of forfeiting $50 a day to the aggrieved party for each day of refusal to receive such freight and all damages actually sustained.[1]

---

[1] Agents or other officers of railroads and other transportation companies whose duty it is to receive freight shall receive all articles of the

Defendants in error brought suit against plaintiff in error, herein called the railway company, in one of the courts of North Carolina, to recover penalties and damages for the failure of the railway company, in violation of the statute, on dates from September 17 to September 23, 1907, to receive goods tendered to it by Etta C. Reid, defendant in error, at Charlotte, North Carolina, for transportation to a point in the State of West Virginia.

The material facts, as stipulated, are as follows: The railway company is a Virginia corporation, and is a common carrier, and operates a line of railroad from the city of Charlotte to the city of Alexandria, Virginia, and another line to the city of Richmond. Davis is a town in West Virginia, and a terminus of a branch road of the Western Maryland Railroad Company, six miles long, running from a point on the railroad, known as Thomas, to Davis.

The railway company operates no line of railroad or other means of conveyance to Davis, nor does it connect with the Western Maryland Railroad's line.

On the seventeenth of September, 1907, Etta C. Reid tendered to the railway company at its depot in Charlotte, where it usually accepts freight, a lot of household goods

---

nature and k. d received by such company for transportation whenever tendered at a regular depot, station, wharf or boat landing, and every loaded car tendered at a side track, or any warehouse connected with the railroad by a siding, and shall forward the same by the route selected by the person tendering the freight under existing laws; and the transportation company represented by any person refusing to receive such freight shall forfeit and pay to the party aggrieved the sum of fifty dollars for each day said company refuses to receive said shipment of freight, and all damages actually sustained by reason of the refusal to receive freight. If such loaded car be tendered at any siding or warehouse at which there is no agent, notice shall be given to an agent at the nearest regular station at which there is an agent that such car is loaded and ready for shipment. (Code of North Carolina, 1905, sec. 2631.)

and kitchen furniture and offered to pay the freight charges thereon. She demanded that the company issue to her a bill of lading "reading from Charlotte, in the State of North Carolina, to Davis, in the State of West Virginia, consignee to be Samuel Hammock." The railway company declined to name a rate to be charged for the transportation of the goods, declined to permit her to prepay the freight charges from Charlotte to Davis, declined to receive the goods for shipment, and declined to issue a bill of lading therefor.

She renewed her request on four successive days, and, with each demand, the company refused to comply. On September 23, 1907, the company named the sum of $34.08 as the amount necessary to prepay the freight charges on the shipment from Charlotte to Davis, and thereupon she paid the said sum and the company issued a bill of lading to her.

On September 17, 1907, no through and joint rate of freight had been established by the railway company and the Western Maryland Railroad Company and other roads which the shipment would have to pass over going from Charlotte to Davis, "and no such rates had been filed with the Interstate Commerce Commission and no rate of freight had been established or filed with the Interstate Commerce Commission, or published, covering shipments between said points." On that day, when Etta C. Reid made her demand of the railway company, the company's agent advised her that there was no established rate for the shipment, that no rate had been filed or published, that he did not know the rate, that he had no authority to receive the goods or the freight charges thereon to destination and no authority to issue a bill of lading reading "final destination, Davis, in the State of West Virginia."

The agent wired the officer having charge of such matters to obtain authority to name a through and joint rate,

to receive the shipment and issue a bill of lading. Immediately thereafter the officers of the company took up with the officers of the companies over whose lines the shipment of freight would have to move the establishment of a rate, with the result that a rate was established. On Monday, September 23, 1907, the local agent was informed of such rate and given authority to receive the shipment and to issue a bill of lading. Thereupon the company received the shipment, accepted the amount of freight in accordance with the joint and through rate, and issued the bill of lading.

There is, and was at the date of the tender of the goods, a telegraph office at Davis. Mrs. Reid remained at Charlotte for the time mentioned awaiting the establishment of the rate.

It is stipulated that she was damaged in the sum of $25, for the recovery of which and the penalties prescribed by the statute she asked the court to adjudge.

The railway company resisted the demand and contended that to hold that the act was applicable to it would violate the commerce clause of the Constitution of the United States.

Judgment was awarded to defendants in error as prayed, and it was affirmed by the Supreme Court of the State, two members of the court dissenting. 153 No. Car. 490.

This statement indicates the questions which are presented for solution and the principles upon which the solution of them depends. It hardly needs to be stated that transportation of property between the States is interstate commerce, and may be of Federal rather than of state jurisdiction. We say may be of Federal jurisdiction, for interstate commerce in its practical conduct has many incidents having varying degrees of connection with it and effect upon it over which the State may have some power. As to the extent of the power and the occasions for its exercise, controversies have arisen, and in deciding which

the power of the State over the general subject of commerce has been divided into three classes: First, those in which the power of the State is exclusive; second, those in which the States may act in the absence of legislation by Congress; third, those in which the action of Congress is exclusive and the State cannot act at all. *Covington &c. Bridge Co.* v. *Kentucky,* 154 U. S. 204, 209; *Western Union Telegraph Co.* v. *James,* 162 U. S. 650, 655.

These divisions, however, express but the extreme boundaries of the subject. Something more definite is necessary for the decision of the opposing contentions in the case at bar. The Supreme Court of the State was of the view that the statute simply regulated a duty which preceded the entry of the goods in interstate commerce, and concluded, therefore, that the statute was "neither an interference with nor a burden upon interstate commerce." And it decided that the execution of this duty was not precluded by the provision of the Interstate Commerce Act requiring a schedule of tariffs to be established and charged. It was said by the court that it was the duty of the railway company to file such schedule, and that the company could not justify the violation of its common law duty by the neglect of its statutory duty.

The case, however, is not quite in such narrow compass. There is something more to be considered than the accumulation of defaults, if there be defaults. It is undoubtedly the duty of a railway company to receive freight when tendered for transportation. It may, besides, have other obligations, but it does not follow that it is within the power of the State to enforce them. There may be a Federal exertion of authority which takes from a State the power to regulate the duties of interstate carriers or to provide remedies for their violation. This is realized by defendants in error, and they assert that the state statute is in aid of commerce, and not an interference with or burden upon it, and therefore must be sustained as a valid exer-

cise of the State's power, citing *Atlantic Coast Line R. R. Co.* v. *Mazursky*, 216 U. S. 122; *Western Union Tel. Co.* v. *James*, 162 U. S. 650.

In those cases, and in the later case of *Western Union Tel. Co.* v. *Milling Co.*, 218 U. S. 406, the principle is expressed that "there are many occasions where the police power of the State can be properly exercised to insure a faithful and prompt performance of duty within the limits of the State upon the part of those engaged in interstate commerce." Such exercise of power, it was further said, was in aid of interstate commerce, and, although incidentally affecting it, did not burden it. But the facts of those cases distinguish them from the case at bar, and make their principle inapplicable. In the Telegraph Company cases there was a failure to transmit or deliver telegrams, in violation of the duty so to do imposed by the particular state statutes. In the railroad case a statute of the State of South Carolina which required carriers to settle within a specified time claims for loss of or damages to freight while in their possession within the State was sustained against the objection that it was an interference with interstate commerce. In none of the cases, however, was there any Federal legislation upon the subject involved, and in all of them such circumstance was stated as an element of decision. The circumstance is important, and we are brought to the inquiry whether it exists in the present case.

It is well settled that if the State and Congress have a concurrent power, that of the State is superseded when the power of Congress is exercised. The question occurs: To what extent and how directly must it be exercised to have such effect? It was decided in *Missouri Pacific Railway Co.* v. *Larabee Mills*, 211 U. S. 612, that the mere creation of the Interstate Commerce Commission and the grant to it of a large measure of control over interstate commerce does not, in the absence of action by it, change the rule

that Congress by nonaction leaves power in the States over merely incidental matters. "In other words," and we quote from the opinion (p. 623), "the mere grant by Congress to the commission of certain national powers in respect to interstate commerce does not of itself and in the absence of action by the commission interfere with the authority of the State to make those regulations conducive to the welfare and convenience of its citizens. . . . Until specific action by Congress or the commission the control of the State over those incidental matters remains undisturbed." The duty which was enforced in the state court was the duty of a railroad company engaged in interstate commerce to afford equal local switching service to its shippers, notwithstanding the cars concerning which the service was claimed were eventually to be engaged in interstate commerce. This duty was declared (p. 624) to be a common law duty which the State might, "at least in the absence of Congressional action, compel a carrier to discharge."

The principle of that case, therefore, requires us to find specific action either by Congress in the Interstate Commerce Act or by the Commission covering the matters which the statute of North Carolina attempts to regulate. There is no contention that the Commission has acted, so we must look to the act. Does it, as contended by plaintiff in error, take control of the subject-matter and impose affirmative duties upon the carriers which the State cannot even supplement? In other words, has Congress taken possession of the field?

It is not possible to epitomize the act by giving a more particular designation than that it was designed to regulate interstate commerce. Something more was certainly intended by it than the mere ordaining or the supervision of the movement of goods. In a certain general way traffic would be regulated by railroad and shipper, but their powers were not equal. The railroads had the

greater power, and might and did exercise it in unreasonable charges and in discriminations. The potent instrument for this was the difference in the rate charged for transportation or by secret rebates if the charge was not discriminating in the first instance. Hence we said, in *Texas & Pacific Ry.* v. *Abilene Oil Co.*, 204 U. S. 426, 437: "The act made it the duty of carriers subject to its provisions to charge only just and reasonable rates." To that end, it was further said, schedules of rates were required to be established and published, and departure from the rates established, except in the manner authorized by the act, was forbidden under criminal penalties, and any injury to persons was provided to be redressed through application to the Commission or to the courts. And it is provided that "if no joint rate over a through route has been established, the several carriers in such through route shall file, print and keep open to public inspection, as aforesaid, the separately established rates, fares and charges applied to the through transportation."

The Commission is given the power to determine and prescribe the manner in which the schedules required by the act are to be kept. And it is enacted that, unless otherwise provided, no carrier "shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act."

It is evident, therefore, that Congress has taken control of the subject of rate making and charging. All of the particular details we cannot set forth without extensive quotation from the act, which it is quite inconvenient to make. The provisions of the act are directed at the abuses most to be feared, unreasonableness in the rates and discriminations, including in the latter discriminations in service, in the acceptance and delivery of freight and in facilities fur-

nished. The power which has been given to the Commission to secure those results we have set forth in *Texas &c. Ry. Co.* v. *Abilene Oil Co. supra,* and in *Baltimore & Ohio R. R. Co.* v. *Pitcairn Coal Co.,* 215 U. S. 481. In the first case it was said (p. 439): "It is apparent that the means by which these great purposes were to be accomplished was the placing upon all carriers the positive duty to establish schedules of reasonable rates which should have a uniform application to all and which should not be departed from so long as the established schedule remained unaltered in the manner provided by law." After citing cases, it was further said (p. 439): "When the general scope of the act is enlightened by the considerations just stated it becomes manifest that there is not only a relation, but an indissoluble unity between the provision for the establishment and maintenance of rates until corrected in accordance with the statute and the prohibitions against preferences and discrimination." In that case it was decided that a shipper could not maintain an action at common law in a state court on the ground that a rate established in accordance with the Interstate Commerce Act was unreasonable. In the second case was considered the power of the Commission under the amendments of 1906, and it was decided that on the principles announced in the *Abilene case,* and from a consideration of the amendments and their purpose to supply the defects of the act and enlarge the powers of the Commission, the distribution of coal cars by the railroad company among shippers was a matter involving preference and discrimination, and within the competency of the Interstate Commerce Commission to consider, and that the courts could not interfere with such distribution until after action by the Commission. This was resolved notwithstanding § 23 of the act gave jurisdiction to the Circuit and District Courts of the United States to command, at the suit of one aggrieved, a common carrier "to move and trans-

port the traffic or to furnish cars or other facilities for transportation." And transportation means not only the physical instrumentalities, but all services in connection with receipt, delivery and handling of property trans- ported, and such transportation the carrier must "pro- vide and furnish upon reasonable request therefor." (Section 1, paragraph 2, of the act, as amended June 29, 1906, by the Hepburn Act, 34 Stat. 584, c. 3591.) Sec- tion 20 of the latter act requires the carrier to issue a bill of lading for an interstate shipment, and makes the carrier liable for the loss of or damage to property while on its own line, and also while on the lines over which the property may pass.

There is scarcely a detail of regulation which is omitted to secure the purpose to which the Interstate Commerce Act is aimed. It is true that words directly inhibitive of the exercise of state authority are not employed, but the subject is taken possession of. We are, therefore brought to consider what the statute of North Carolina provides. Leaving out qualifications with which we are not con- cerned, the act requires railroad companies to receive freight for transportation whenever tendered at a regular station and forward the same over the route selected by the person offering the shipment. Fifty dollars a day is the penalty prescribed for refusal, and all the damages incurred.

The particular act which was held to violate the statute was refusing the tender of goods for shipment from Char- lotte, North Carolina, to Davis, West Virginia, that is, a tender for interstate shipment, and a demand coinciden- tally for a bill of lading covering the shipment explicitly stating the origin of the shipment at Charlotte and its des- tination at Davis. The Supreme Court of the State de- cided, as we have seen, that the statute deals with a com- mon law duty simply, one which attaches before freight enters into interstate commerce, and hence concluded as

follows: "The statutory enforcement under penalty of the common law duty to accept freight 'whenever tendered' is not within the scope or terms of any act of Congress. It is neither an interference with nor a burden upon interstate commerce." We are unable to agree with the conclusion. It would destroy absolutely Federal control until the freight was in the possession of the carrier, and is directly contradictory of the provision of the Interstate Commerce Act which we have quoted. See, in this connection, *Houston & Texas Cent. R. R. Co.* v. *Mayes,* 201 U. S. 321. In the term "transportation," we have seen, Congress has included "all services in connection with the receipt . . . of property transported." And this certainly imposes the obligation to receive the property as well as to carry it, one of the obligations the carrier must perform "upon reasonable request therefor." Other provisions of the same import and direction might be quoted. Conditions put on the receipt of articles at the railroad station may be conditions upon the traffic, and necessarily are within the regulating power of Congress. Their inducement and aim may be to secure a prompter performance of duty by the carrier, and so far beneficent. But that is not the question. The question is, Where is the control, in the State or Congress, and has Congress acted? That the control is in Congress we have seen; that it has acted is demonstrated by the provisions of the Interstate Commerce Act to which we have referred. As we have seen, schedules of rates, whether the road be single or forms with another a "through route," must be established, filed and published, designating the places. They cannot be changed without permission of the Interstate Commerce Commission, and no carrier is permitted to engage or participate in the transportation of passengers or property unless the rates for the same have been so filed and published. Criminal punishments are imposed for violations of these requirements, and civil redress of in-

juries received by shippers is given through the Interstate
Commerce Commission.    See *Robinson* v. *B. & O. R. R.
Co.* (appears in next number).    By these provisions Con-
gress has taken possession of the field of regulation, with
the purpose, which we have already pointed out, to keep
under the eye and control of the Commission the rates
charged and the action of the railroad in regard to them,
to secure their reasonableness and to secure their impar-
tial application.    The statute of North Carolina conflicts
with these requirements.    What they forbid the carrier
to do the statute requires him to do, and punishes dis-
obedience by successive daily penalties.

We cannot assume that it was without consideration
of its necessity that Congress enacted § 2 of the Hep-
burn Act.    It was no doubt the adaptation of experience
to the exigencies of a practical problem, Congress coming
to believe that the most effective way to prevent pref-
erences in charges by carriers was to forbid them to "en-
gage or participate in the transportation of passengers or
property" until they had fixed and proclaimed the rate to
be charged therefor—a rate that would be not only for one
shipper or shipment, but for all shippers and shipments;
not for one time only, but for all times.    The power of Con-
gress to so provide cannot be doubted.    If the regulation
be not exclusive, this situation is presented: If the car-
rier obey the state law, he incurs the penalties of the Fed-
eral law; if he obey the Federal law, he incurs the penal-
ties of the state law.    Manifestly one authority must be
paramount, and when it speaks the other must be silent.
We can see no middle ground.    In so deciding we take no
essential power from the States.    The balances of the Con-
stitution are only preserved and there is given to the States
the power which is the States' and to Congress the power
which belongs to Congress.

But if there be a middle ground, it certainly can be
argued that the cases establish that it is passed when the

state regulation burdens interstate commerce, and whether a regulation has such effect may be determined by its sanctions. If a penalty of $50 for refusing to receive freight "when tendered" be no burden on interstate commerce beyond the power of a State to impose, would a penalty of $100 or $1,000 likewise be no burden? May not the power which is competent to impose a penalty select its amount? The penalty of the North Carolina statute, it is to be remembered, is independent of the damage received, and what excuses or defenses may be offered the decisions of the court leave in doubt. The statute seems to permit none. The case at bar illustrates somewhat its peremptory character, and the case which was argued with this (*Southern Railway Company* v. *Reid and Beam, post,* p. 444,) still more so. The plaintiffs in that action sued for $750 for refusal to receive and forward a carload of shingles and recovered $350, although one of them testified that they "never lost a cent." The circumstance was declared by the court, citing a prior case, to be immaterial, as the penalties were "not given wholly on the idea of making pecuniary compensation to the party injured, but usually for the more important purpose of enforcing the performance of a duty required by public policy or positive statutory enactment." The policy of the statute, then, is to require the acceptance of freight "when tendered," with daily accumulating penalties upon refusal to do so. If such power be conceded, what is the limit of its exercise, either as to conditions or penalties?

One other contention remains to be noticed. It is said that there is not presented in the case the dilemma of alternative penalties, for the Hepburn Act, it is pointed out, requires a schedule of rates to be filed only "when the through route and joint rate have been established," and that none were established in the case at bar and that, therefore, the railway company was not put to a choice of obligations and subjected to punishment however it might

choose. But it is also provided that "if no joint rate over the through route has been established, the several carriers in such through route shall file, print, and keep open to public inspection as aforesaid, the separately established rates, fares and charges applied to the through transportation." There is nothing in the record to show that there were such established separate rates and that separately established rates were published and kept open for inspection. Indeed, the record shows that a through rate had to be fixed by the several carriers in the through route.

It was only because of the obligation imposed by the Hepburn Act that the railway company refused to receive the goods tendered to it and the agent of the company informed defendant in error that he was without power to comply with her demand. He promptly acted in the matter when the lines over which the freight had to pass established a joint rate. He then received the goods, issued a bill of lading therefor, "and the shipment went forward to its destination."

*The judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.*