[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 65 
September 15, 1913. The opinion of the Court was delivered by
Plaintiff recovered judgment against defendant in a magistrate's Court for $14.75 damages done to a shipment of furniture, while in defendant's possession in this State, and $4.60, overcharges in the freight collected by defendant thereon, and $50, the penalty allowed by statute (Civ. Code, 1912, section 2573), for the failure of defendant to pay plaintiff's claim for said damages and overcharge within 40 days after the filing thereof with defendant's agent. The initial carrier, the Southern Railway Company, received the shipment at High Point, N.C. to be transported over its *Page 66 
own and connecting lines and delivered to plaintiff at Varnville, S.C. and issued its usual bill of lading therefor. Defendant received the shipment from the Southern Railway Company at Allendale, S.C. and delivered same to plaintiff at destination in a damaged condition. The Circuit Court affirmed the magistrate's judgment.
The only question made in the Courts below and brought here by the grounds of appeal is that the statute above cited, under which defendant was penalized for its failure to pay plaintiff's claim within the time required, is void, as applied to interstate commerce, because: (a) It unlawfully regulates and unreasonably burdens the same; and (b) it deprives defendant of its property without due process of law, and denies to it the equal protection of the laws; and (c) it is in conflict with that provision of the Federal statute regulating interstate commerce known as the Carmack amendment (Act June 29, 1906, c. 3591, sec. 7, pars. 11, 12, 34 Stat. 593 [U.S. Comp. St. Supp. 1911, p. 1308]).
The learned counsel for appellant admits that the first and second grounds above stated have been foreclosed by the decisions of this Court which have been affirmed by the Supreme Court of the United States in A.C.L.R.Co. v. Mazursky, 216 U.S. 122, 30 Sup. Ct. 378,54 L.Ed. 411, in which the validity of the statute now under consideration was affirmed. He contends, however, that the third ground was not involved in any of those cases, and that the effect of the Federal statute above referred to, as it has been interpreted and applied in recent decisions of the Federal Supreme Court, has been to supersede and annul the State statute.
It has been said that the delicts upon which the penalties were inflicted in the Mazursky case, and the others decided with it, occurred prior to the adoption of the Carmack amendment. As to that matter, the reports of those cases (except the Carl case) are silent. But, if the fact be as stated by appellant's counsel, it is true that *Page 67 
the Federal statute would not have defeated the recovery of penalties incurred prior to its enactment. Yazoo etc.R. Co. v. Greenwood Grocery Co., 227 U.S. 1,33 Sup. Ct. 213, 57 L.Ed. 389, decided January 20, 1913.
But the arguments in the Supreme Court of the United States in the Mazursky case show that the point was made and pressed upon the attention of the Court that, if the State ever had power to enact this statute, it was valid only until Congress should take action upon the same subject, and that Congress having taken such action, by the passage of laws regulating interstate commerce in great detail, it had thereby excluded or superseded the power of the State. At the time those cases were argued, the Carmack amendment had been on the statute books over three years; and, if it had the effect which is now claimed for it, it is strange that it was not mentioned either by counsel who argued the cause or by the Court in its opinion in disposing of the contention above stated, as was done in the Greenwood Grocery Company's case above cited; with regard to a similar effect given to the provisions of the Hepburn act. The omission points with force to the conclusion that it was not supposed, either by counsel or by the Court, to have any bearing upon the point at issue. Because, even though for the reason above stated it could not have controlled the decision, yet it would almost certainly have been advanced as an argument tending to show the intention of Congress to take possession of the field covered by the State statute. Besides this, the Mazursky case has been cited several times by the Supreme Court of the United States in cases subsequently decided, which involved the superseding effect of the provisions of the Federal statute regulating interstate commerce upon conflicting State laws, without any intimation that its authority is limited by the fact suggested. On the contrary, in Southern Ry. Co.
v. Reid, 222 U.S. 436, 32 Sup. Ct. 140, 56 L.Ed. 260, in answering the contention, which was based upon the authority *Page 68 
of the Mazursky case and the James case, 162 U.S. 650,16 Sup. Ct. 934, 40 L.Ed. 1105, that the North Carolina statute under consideration was a valid exercise of the police power of the State, the Court said: "In those cases, and in the later case of Western U. Tel. Co. v. CommercialMill Co., 218 U.S. 406, 31 Sup. Ct. 49, 54 L.Ed. 1088
(36 L.R.A. (N.S.) 220, 21 Ann. Cas. 815), the principle is expressed that `there are many occasions where the police power of the State can be properly exercised to insure a faithful and prompt performance of duty within the limits of the State upon the part of those engaged in interstate commerce.' Such exercise of power, it was further said, was in aid of interstate commerce, and, although incidentally affecting it, did not burden it. But the facts of those cases distinguish them from the case at bar, and make their principle inapplicable. In the telegraph company cases, there was a failure to transmit or deliver telegrams, in violation of the duty so to do imposed by particular State statutes. In the railroad case, a statute of the State of South Carolina which required carriers to settle within a specified time claims for loss of or damage to freight while in their possession within the State was sustained against the objection that it was an interference with interstate commerce.In none of the cases, however, was there any Federallegislation upon the subject involved, and in all of themsuch circumstance was stated as an element of decision. The circumstance is important, and we are brought to the inquiry whether it exists in the present case." (Italics added.) It appears, therefore, that, even as late as the decision of the Reid case, which was filed in January, 1912, the Court had not discovered that there was any conflict between the Carmack amendment and this statute, the validity of which was affirmed in the Mazursky case upon the ground of the absence of "any Federal legislation uponthe subject involved." *Page 69 
But, treated as an open question, the conclusion is inevitable that there is no such conflict. We wish to make it clear at the outset that we concede that the authority of Congress to regulate interstate and foreign commerce is supreme and unlimited, except by the Federal Constitution, and that, when Congress legislates upon any particular subject of such commerce, all conflicting State laws, whether statute or common law, affecting the same subject, are thereby superseded. On the other hand, we maintain that, in the absence of such legislation, the police power of the State remains unimpaired. These propositions are universally recognized, and they have been reaffirmed in the very latest decisions of the Supreme Court of the United States. Smith v. Alabama, 124 U.S. 465,8 Sup. Ct. 564, 31 L.Ed. 508; Chicago etc. R. Co. v.Solan, 169 U.S. 133, 18 Sup. Ct. 289, 42 L.Ed. 688; PennsylvaniaR, Co. v. Hughes, 191 U.S. 477, 24 Sup. Ct. 132,48 L.Ed. 268; Chicago etc. R. Co. v. Arkansas, 219 U.S. 453,31 Sup. Ct. 275, 55 L.Ed. 290; Adams Express Co. v.Croninger, 226 U.S. 491, 33 Sup. Ct. 148, 57 L.Ed. 314, decided January 6, 1913; Simpson v. Shepherd, 230 U.S. 352,33 Sup. Ct. 729, 57 L.Ed. 1511 (Minnesota rate case), decided June 9, 1913.
Let us inquire, then, what is meant by "the subject," when it is said that, when Congress has legislated upon or taken possession of "the subject," inconsistent State laws are superseded. This question was considered in SouthernRailway Co. v. Reid, supra, where the Court said: "It is well settled that if the State and Congress have a concurrent power, that of the State is superseded when the power of Congress is exercised. The question occurs, to what extent and how directly must it be exercised to have such effect? It was decided in Missouri P.R. Co. v. LarabeeFlour Mills Co., 211 U.S. 612, 29, Sup. Ct. 214,53 L.Ed. 352, that the mere creation of the interstate commerce commission and the grant to it of a large measure of control *Page 70 
over interstate commerce does not, in the absence of action by it, change the rule that Congress by nonaction leaves power in the States over merely incidental matters. `In other words,' and we quote from the opinion, * * * `the mere grant by Congress to the commission of certain national powers in respect to interstate commerce does not of itself and in the absence of action by the commission interfere with the authority of the State to make those regulations conducive to the welfare and convenience of its citizens. * * * Until specific action by Congress or the commission the control of the State over those incidental matters remains undisturbed.' The duty which was enforced in the State Court was the duty of a railroad company engaged in interstate commerce to afford equal local switching service to its shippers, notwithstanding the cars concerning which the service was claimed were eventually to be engaged in interstate commerce. This duty was declared * * * to be a common-law duty which the State might, `at least, in the absence of congressional action, compel a carrier to discharge.' The principle of that case, therefor, requires us to find specific action, either by Congress in the interstate commerce act, or by the commission, covering the matters which the statute of North Carolina attempts to regulate." (Italics added.)
The same question is so clearly and fully discussed inSavage v. Jones, 225 U.S. 501, 32 Sup. Ct. 715,56 L.Ed. 1182, and that case is so directly in point, that we quote from the opinion at length. After stating that the statute of Indiana, which was assailed in that case, and which was adopted in 1907, after the passage of the pure food and drugs act of Congress of June 30, 1906 (Act June 30, 1906, c. 3915, 34 Stat. 769 [U.S. Comp. St. Supp. 1911, p. 1354]), covered the same general subject, the Court pointed out that the provisions of the State statute upon which it was attacked as being in conflict with the food and drugs act were not included in the legislation of Congress, and on *Page 71 
that ground it was held that there was no conflict between the two, and that the State law was therefore valid. The Court said:
"But this (the legislation of Congress) does not coverthe entire ground. It is one thing to make a false or misleadingstatement regarding the article or its ingredients
(the thing prohibited by the act of Congress), and it maybe quite another to give no information as to what theingredients are (the thing required by the State statute). As is well known, products may be sold, and in case of so-called proprietary articles frequently are sold, under trade-names which do not reveal the ingredients of the composition, and the proprietors refrain from revealing them. Moreover, in defining what shall be adulteration or misbranding for the purposes of the Federal act, it is provided that mixtures or compounds known as articles of food under their own distinctive names, not taking or imitating the distinctive name of another article, which do not contain `any added poisonous or deleterious ingredients,' shall not be deemed to be adulterated or misbranded if the name be accompanied on the same label or brand with a statement of the place of manufacture. * * * Congress has thus limitedthe scope of its prohibitions. It has not included that atwhich the Indiana statute aims. Can it be said that Congress, nevertheless, has denied to the State, with respect to the feeding stuffs coming from another State and sold in the original packages, the power the State otherwise would have to prevent imposition upon the public by making a reasonable and nondiscriminatory provision for the disclosure of ingredients, and for inspection and analysis? If there be such denial, it is not to be found in any express declaration to that effect. Undoubtedly Congress, by virtue of its paramount authority over interstate commerce, might have said that such goods should be free from the incidental effect of a State law enacted for these purposes. But it did not so declare. There is a proviso in the section *Page 72 
defining misbranding for the purposes of the act, that `nothing in this act shall be construed' as requiring manufacturers of proprietary foods which contain no unwholesome added ingredients to disclose their trade formulas, `except in so far as the provisions of this act may require to secure freedom from adulteration or misbranding.' Section 8. We have already noted the limitations of the provisions referred to. And it is clear that this proviso merely relates to the interpretation of the requirements of the act, and does not enlarge its purview or establish a rule as to matters which lie outside its prohibitions.
"Is, then, a denial to the State of the exercise of its power for the purposes in question necessarily implied in the Federal statute? For when the question is whether a Federal act overrides a State law, the entire scheme of the statute must, of course, be considered, and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished — if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect — the State law must yield to the regulation of Congress within the sphere of its delegated power. Texas P.R.Co. v. Abilene Cotton Oil Co., 204 U.S. 426
(27 Sup. Ct. 350), 51 L.Ed. 553, 9 Ann. Cas. 1075; Northern P.R. Co.
v. Washington, 222 U.S. 370, 32 Sup. Ct. 160
(56 L.Ed. 237); Southern R. Co. v. Reid, 222 U.S. 424, 436,32 Sup. Ct. 140 (56 L.Ed. 257).
"But the intent to supersede the exercise by the State ofits police power as to matters not covered by the Federallegislation is not to be inferred from the mere fact thatCongress has seen fit to circumscribe its regulation and tooccupy a limited field. In other words, such intent is notto be implied unless the act of Congress, fairly interpreted,is in actual conflict with the law of the State. This principle has had abundant illustration. Chicago. M. St. P.R. Co. v. Solan, 169 U.S. 133, 18 Sup. Ct. 289, *Page 73 42 L.Ed. 688; Missouri, K. T.R. Co. v. Haber, 169 U.S. 613,18 Sup. Ct. 488, 42 L.Ed. 878; Reid v. Colorado, 187 U.S. 137,23 Sup. Ct. 92, 47 L.Ed. 108; Pennsylvania R. Co. v.Hughes, 191 U.S. 477, 24 Sup. Ct. 132, 48 L.Ed. 268;Crossman v. Lurman, 192 U.S. 189, 24 Sup. Ct. 234,48 L.Ed. 401; Asbell v. Kansas, 209 U.S. 251,28 Sup. Ct. 485, 52 L.Ed. 778, 14 Ann. Cas. 1101; Northern P.R. Co.
v. Washington, 222 U.S. 370, 379, 32 Sup. Ct. 160,56 L.Ed. 237, 240; Southern R. Co. v. Reid, 222 U.S. 424, 442,32 Sup. Ct. 140, 56 L.Ed. 257, 262.
"In Missouri, K. T.R. Co. v. Haber, 169 U.S. 613,18 Sup. Ct. 488, 42 L.Ed. 878, the Supreme Court of Kansas had affirmed a judgment against the railway company for damages caused by its having brought into the State certain cattle alleged to have been affected with Texas fever, which was communicated to the cattle of the plaintiff. The recovery was based upon a statute of Kansas which made actionable the driving or transporting into the State of cattle which were liable to communicate the fever. It was contended that act Cong. May 29, 1884, c. 60, 23 Stat. at L. 31 (U.S. Comp. St. 1901, p. 299), known as the animal industry act, together with act March 3, 1891, c. 544, 26 Stat. at L. 1044, appropriating money to carry out its provisions, and section 5258 of the Revised Statutes (U.S. Comp. Stat. 1901, p. 3564), covered substantially the wholesubject of the transportation from one State to anotherState of live stock capable of imparting contagious disease, and therefore that the State of Kansas had no authority to deal in any form with that subject. The act of 1884 provided for the establishment of a bureau of animal industry, for the appointment of a staff to investigate the condition of domestic animals, and for the report upon the means to be adopted to guard against the spread of disease. Regulations were to be prepared by the commissioner of agriculture and certified to the executive authority of each State and territory. Special investigation was to be made for *Page 74 
the protection of foreign commerce, and the secretary of the treasury was to establish such regulations as might be required concerning exportation. It was provided that no railroad company within the United States, nor the owners or masters of any vessel, should receive for transportation, or transport, from one State to another, any live stock affected with any communicable disease, nor should any one deliver for such transportation, or drive on foot or transport in private conveyance from one State to another, any live stock knowing them to be so affected. It was made the duty of the commissioner of agriculture to notify the proper officials or agents of transportation companies doing business in any infected locality of the existence of contagion; and the operators of railroads, or the owners or custodians of live stock within such infected district, who should knowingly violate the provisions of the act, were to be guilty of a misdemeanor punishable by fine or imprisonment.
"The Court held that this Federal legislation did not override the statute of the State; that the latter created a civil liability as to which the animal industry act of Congress had not made provision. The Court said (169 U.S. 623,624 [18 Sup. Ct. 492, 42 L.Ed. 878], supra): `May not thesestatutory provisions stand without obstructing or embarrassingthe execution of the act of Congress? This question must of course be determined with reference to the settled rule that a statute enacted in execution of a reserved power of the State is not to be regarded as inconsistent with an act of Congress passed in the execution of a clear power under the Constitution, unless the repugnance or conflict isso direct and positive that the two acts cannot be reconciledor stand together. Sinnot v. Davenport, 22 How. 227, 243,16 L.Ed. 243, 247. * * * Whether a corporation transporting, or the person causing to be transported, from one State to another cattle of the class specified in the Kansas statute should be liable in a civil action for any damages *Page 75 
sustained by the owners of domestic cattle by reason of the introduction into their State of such diseased cattle is a subject about which the animal industry act did not make any provision. That act does not declare that the regulations established by the department of agriculture should have the effect to exempt from civil liability one who, but for such regulations, would have been liable either under the general principles of law or under some State enactment for damages arising out of the introduction into that State of cattle so affected. And, as will be seen from the regulations prescribed by the secretary of agriculture, that officer did not assume to give protection to any one against such liability.'
"In Reid v. Colorado, 187 U.S. 137, 23 Sup. Ct. 92,47 L.Ed. 108, the question arose under a statute of Colorado which had been passed to prevent the introduction into the State of diseased animals. The statute made it a misdemeanor for any one to bring into the State between April 1st and November 1st any cattle or horses from a State, territory, or county south of the thirty-sixth parallel of north latitude, unless they had been held at some place north of that parallel at least 90 days prior to importation, or unless the owner or person in charge should procure from the State veterinary sanitary board a certificate, or bill of health, to the effect that the cattle or horses were free from all infectious or contagious diseases, and had not been exposed thereto at any time within the preceding 90 days. The expense of any inspection in connection therewith was to be paid by the owner.
"The plaintiff in error had been convicted of bringing cattle into the State in violation of the statute. There was no proof in the case that the particular cattle had any infectious or contagious disease, but it did appear that they were brought from Texas, south of the thirty-sixth parallel, without being held or inspected as the statute required. Its provisions were ignored altogether as invalid legislation. *Page 76 
When the plaintiff in error refused to assent to the State inspection he showed to the authorities a certificate signed by an assistant inspector of the Federal bureau of animal industry, who certified that he had carefully inspected the cattle in Texas and found them free from communicable disease. It was insisted that the statute of Colorado was in conflict with the animal industry act of Congress, but the Court sustained the State law for the reason that, although the two statutes related to the same general subject, they did not cover the same ground, and were not inconsistent with each other.
"The Court thus emphasized the general principle involved (187 U.S. 148, 23 Sup. Ct. 96, 47 L.Ed. 108,supra): 'It should never be held that Congress intends tosupersede or by its legislation suspend the exercise of thepolice power of the States, even when it may do so, unlessits purpose to effect that result is clearly manifested. ThisCourt has said — and the principle has often been reaffirmed— that "in the application of this principle of supremacy ofan act of Congress in a case where the State law is but theexercise of a reserved power, the repugnance or conflictshould be so direct and positive, so that the two acts shouldnot be reconciled or consistently stand together."'" (Italics added.)
In each of the cases hereinbefore cited, the Court holds that the police power of the State still exists unimpaired, except in so far as laws adopted thereunder may conflict with the legislation of Congress upon the same subject. Therefore we cannot accept as sound the contention of appellant's counsel that the Supreme Court of the United States has held that the act to regulate commerce "was intended to cover and regulate the entire subject of interstate state commerce, leaving nothing to the State, either by way of legislation, policy, or regulation." To sustain that contention, he cites the following from the Croninger case: "Almost every detail of the subject is covered so completely *Page 77 
that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all State regulation with reference to it." When the language quoted is given its proper setting, and read in connection with the context, it clearly appears that "the subject" referred to was not the whole subject of interstate commerce, but the limited subject "of liability of the carrierunder a bill of lading which he must issue," as required by the Carmack amendment. The whole paragraph from which the quotation is taken reads as follows: "That the legislation (the Carmack amendment) supersedes all the regulations and policies of a particular State upon the samesubject results from its general character. It embraces thesubject of the liability of the carrier under a bill of ladingwhich he must issue, and limits his power to exempt himself by rule, regulation, or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all State regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the State upon the subjectof such contracts. But when Congress acted in such a way as to manifest a purpose to exercise its conceded authority, the regulating power of the State ceased to exist." (Italics added.) Read as a whole, the passage shows clearly that "the subject" which the Court had in mind was "the subject of such contracts;" that is, of liability on contracts which any carrier receiving property for interstate transportation is required to issue.
Having seen what the subject of the Carmack amendment is, let us examine the State statute to see what subject is dealt with by it, and thereby determine whether they cover the same subject, and whether there is any conflict between them. The State statute merely penalizes the failure of carriers to perform a common-law duty — namely, the duty to make reasonably prompt settlement of the claims of shippers *Page 78 
for loss of or damage to property while in their possession. The performance, or the failure of performance, of that duty has nothing whatever to do with the liability of the carrier under the contract of shipment. The statute does not attempt to impose, increase, or diminish that liability, or to affect it in any way whatever. It merely says that, assuming the liability to exist, the carrier should discharge it with reasonable promptness, and penalizes his failure to do so. With as much reason could it be said that a statute which imposes the costs of the action upon the losing party imposes or affects in any way the liability upon which the action is predicated. The two things are separate and distinct. The payment of costs is imposed as a penalty for failure to pay the debt without suit, and the payment of the penalty is imposed for like reason — the failure to pay a just claim within a reasonable time, without compelling the shipper to resort to the Courts to collect it. Where no liability exists, no penalty can be recovered; and, unless the shipper recovers the full amount which he has claimed, he cannot recover the penalty. The carrier is therefore protected against being penalized for the failure to pay unjust or exorbitant claims.
We look in vain through the legislation of Congress to find any rule or regulation on the subject of the prompt settlement of such claims. By no sort of implication can that subject be brought within the provisions of the Carmack amendment. That it is one proper for the exertion of the State authority, in the absence of congressional action, is settled by the Mazursky case. The reason for the statute and the grounds upon which it should be sustained are set forth in that case and in the Seegers case, 73 S.C. 71,52 S.E. 797, 121 Am. St. Rep. 921, and 207 U.S. 73,28 Sup. Ct. 28, 52 L.Ed. 108. The annulling of it would leave shippers at the mercy of interstate carriers, and allow them to practically confiscate small claims for loss of or damage to property while in their possession; because, in the great *Page 79 
majority of cases, the amounts involved are too insignificant to justify the employment of legal counsel to collect them. That there was great abuse in that regard, and an evil which needed a remedy, is evidenced by the statute.
We shall next consider the decisions of the Supreme Court of the United States which are relied upon by appellant to show that the State statute conflicts with the legislation of Congress, and attempt to show that they cannot be so interpreted. The Carmack amendment reads as follows: "That any common carrier, railroad, or transportation company receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: Provided, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law. That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof."
This legislation was construed and applied in the case ofAdams Express Co. v. Croninger, supra, in which the company was held liable in the State Court for the full value of a diamond ring, and interest thereon, to wit, $137.52, notwithstanding a limitation of the company's liability, by stipulation *Page 80 
in the bill of lading, to the agreed value, to wit, $50, when the shipper had obtained the lower of two alternative rates of transportation, which were based upon the value of commodities above and below $50, which rates had been made and filed with the interstate commerce commission and duly published. The ruling of the State Court was based upon the State law, which declared void all contracts limiting the common-law liability of carriers. The Supreme Court of the United States held that the Carmack amendment indicated "a purpose to bring contracts for interstate shipments under one uniform rule of law not subject to the varying policies and legislation of particular States." That being the purpose, all State laws conflicting therewith were necessarily superseded. As to the liability thereby imposed, the Court said: "The statutory liability, aside from responsibility for the default of a connecting carrier in the route, is not beyond the liability imposed bythe common law as that body of law applicable to carriers has been interpreted by this Court, as well as many Courts of the States." (Italics added.) As the liability imposed (except that for the default of connecting carriers) is not beyond that imposed by the common law, it certainly cannot be said to cover the same field as the statute of this State, which imposed a liability unknown to the common law. We have heretofore pointed out the essential differences between the Federal and State law.
In Kansas City Southern Ry. Co. v. Carl, 227 U.S. 639,33 Sup. Ct. 391, 57 L.Ed. 683 (decided March 10, 1913), the principle of the Croninger case was reiterated, and, in addition, it was held that any valid limitation of liability stipulated for in the bill of lading for the benefit of the initial carrier and its connecting carriers inured to the benefit of each succeeding carrier in the route.
The case of Missouri, K. T.R. Co. v. Harriman Bros.,227 U.S. 657, 33 Sup. Ct. 397, 57 L.Ed. 690 (decided March 10, 1913), came within the principle of the Croninger *Page 81 
and Carl cases, and it was further held, in that case, that a stipulation in the bill of lading limiting the time to 90 days within which an action could be brought against the carrier to enforce the liability incurred thereunder was reasonable and valid, and that it superseded State statutes which declared such a stipulation invalid, in so far as the same were applied to interstate shipments. In each of the foregoing cases, the subjects regulated by the State was embraced in the contract for interstate transportation, control of which had been assumed by Congress in the Carmack amendment.
The case of Chicago etc. R. Co. v. Hardwick Farmers ElevatorCo., 226 U.S. 426, 33 Sup. Ct. 174, 57, L.Ed. 284 (decided January 6, 1913), does not come under the Carmack amendment, but under section 1 of the Hepburn act, amending the original act to regulate commerce. In the Hardwick case, the State Court imposed upon a carrier a penalty provided by a statute of Minnesota for delay in furnishing cars to initiate an interstate shipment. The original act to regulate commerce declared that the term "transportation" should embrace all instrumentalities of shipment or carriage, and the Hepburn act declared that it "shall include cars and other vehicles and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof and all services in connection with the receipt delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported; and it shall be the duty of every carrier subjectto the provisions of this act to provide and furnish suchtransportation upon reasonable requests therefor, and toestablish through routes and reasonable rates applicable thereto." (Italics added.) The Supreme Court reversed the State Court, and held that "Congress has legislated concerning the deliveries of cars in interstate commerce by carriers subject to the act." Not only had the act of Congress *Page 82 
imposed upon such carriers the specific duty of furnishing cars for interstate shipments, but it had gone further and provided remedies and penalties for the violation of that duty. It necessarily followed that the State law was superseded because it covered the same field.
In the case of St. Louis etc. R. Co. v. Edwards, 227 U.S. 265,33 Sup. Ct. 262, 56 L.Ed. 506 (decided February 24, 1913), the Court of Arkansas imposed upon an interstate carrier the penalty provided by what was called "the demurrage statute" of that State, because of a failure to make prompt delivery of freight on arrival at destination. The Supreme Court reversed the judgment, and held under the principle announced in the Hardwick case, that the subject of the delivery of interstate shipments is so far embraced in the provisions of the Hepburn act, above quoted, as to supersede the Arkansas statute, which dealt with the same subject. We fail to see wherein this State statute has anything whatever to do with contracts made by the initial carrier relative to its liability or that of its successors in the route for loss or damage to the property caused by it or them so as to bring it within the principles of the Croninger, Carl, and Harriman cases, or with thereceipt or delivery of interstate shipments so as to bring it within the principles of the Hardwick and Edwards cases.
In this connection, we notice the statement in the argument of appellant's counsel that this Court held in the Charles case, 78 S.C. 36, 58 S.E. 927, 125 Am. St. Rep. 762, that "prompt delivery of goods" is the legal equivalent of "prompt settlement of proper claims for damages," and that the Supreme Court of the United States held the same in the Mazursky case. Counsel has evidently misunderstood the Court. The language used was: "The penalty imposed is for a delict of duty appertaining to the business of a common carrier, and in so far as it may affect interstate commerce, it is an aid thereto by its tendency to promote safe and prompt delivery of goods or its legal equivalent *Page 83 
— prompt settlement of proper claims for damages." From the context, it appears that the Court meant only that the effect of the statute was not to burden interstate commerce, but rather to benefit it, by stimulating carriers to take proper care of goods while in their custody, so that delivery thereof in good condition would be made, knowing that, if they failed in that duty, they would be under the compulsion of the statute to perform the alternate duty of making prompt settlement of proper claims therefor. The language of this Court above quoted, and much more of the opinion of this Court in the Charles case, was quoted in the opinion of the Supreme Court of the United States in the Mazursky case, but no comment was made upon this point, and it was not an element of decision.
Appellant's next contention is that the Carmack amendment conflicts with and supersedes the State statute, because it requires that all actions for loss of or damage to interstate shipments shall be brought against the initial carrier, while the State statute requires that they shall be brought against the terminal carrier. In this appellant has erroneously construed both the Federal and the State statute. The Federal statute does not limit the right or remedy of the holder of the bill of lading, in case of loss or damage, to an action against the initial carrier receiving property for interstate transportation. While it says that carrier shall be liable, on the principle that succeeding carriers in the route are its agents, it does not say that it alone shall be liable, or that the holder of the bill of lading shall pursue that carrier only. On the contrary, the act expressly preserves the right of the holder of the bill of lading to pursue the carrier which actually caused the loss or damage, for it says: "Nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law." Certainly, under the law as it existed at that time, the holder of the bill of lading had a right of *Page 84 
action against the carrier which actually caused the loss or damage. In fact, prior to the Carmack amendment, as the result of the almost universal practice of carriers to limit their liability by stipulation in the bill of lading to loss or damage occurring on their own lines, that was practically the only right he did have, in case of loss of or damage to his goods in the course of interstate transportation; and the fact that he frequently found it very difficult, and sometimes impossible, to find out which one of the several connecting carriers was actually in default, and the expense and inconvenience of prosecuting his claim against a carrier in a distant State, were some of the reasons which led to the adoption of the Carmack amendment. Atlantic Coast LineR. Co. v. Riverside Mills, 219 U.S. 200, 31 Sup. Ct. 164,55 L.Ed. 180, 31 L.R.A. (N.S.) 7. To hold that the initial carrier alone is liable to the holder of the bill of lading would, in many cases, cause the very expense and inconvenience which the statute was designed, in part at least, to obviate. A consignee in South Carolina might be compelled to bring suit against the initial carrier in California to collect a claim on insignificant amount or abandon it, when the carrier whose default caused the loss or damage was at his door. Such a construction of the act would defeat one of its purposes. Why should the owner of the goods be compelled to sue the initial carrier, if he can prove that the terminal carrier lost or injured his goods, and what right has the carrier who lost or injured his goods to contend that he should not be held liable in an action by the owner? If the initial carrier is held on his statutory liability, the carrier in default is liable over to him. What difference can it make to the carrier who is ultimately liable whether he pays the damages to the owner of the goods or to the initial carrier?
It is argued, however, that in the Croninger case, the Supreme Court construed the proviso above quoted as preserving to the holder of the bill of lading only the rights or *Page 85 
remedies which he may have had under existing Federal law. Without conceding that the language of this Court, used in the connection in which it was, can be properly construed to so limit the effect of the proviso, it cannot be denied that, under the law, as it then existed and was administered by the Federal Courts, the holder of such a bill of lading did have a right of action against the carrier which actually caused the loss or damage. Referring to the language in the Croninger case, which is relied upon by counsel for appellant, the Court gave, as an instance of the rights preserved by the proviso, the then existing right of the holder of the bill of lading to a remedy against a succeeding carrier in default, in the following language: "One illustration would be a right to a remedy against a succeeding carrier, in preference to proceeding against the primary carrier, for a loss or damage incurred upon the line of the former."
While the foregoing is sufficient to dispose of this contention, so far as it affects the decision of this case, it might not be amiss, in this connection, to say that the remark of the Court which appellant relies upon was made in answering the contention in argument in that case that all rights and remedies under all existing laws, including State laws which were in conflict with the purpose and intent of the act, were preserved by the proviso. The Court pointed out the absurdity of that construction by showing that it would result in the destruction of the act by the proviso, and in the nullification by a conflicting State law of the regulation of a national subject by the supreme authority of Congress, and said, in answering that argument, that a more rational construction would be "to construe this proviso as preserving to the holder of any such bill of lading any right or remedy which he may have had under existing Federal law at the time of his action." But that was far from saying that that was the proper construction, or the only one, to be given to the proviso. On *Page 86 
the contrary, the Court had already given the proviso the same construction which it had given a similar provision in the act of 1887, in the Abilene case, to wit, "that it was 'evidently only intended to continue in existence such other rights or remedies for the redress of some specific wrong or injury, whether given by the interstate commerce act, or by State statute, or common law, not inconsistent with therules and regulations prescribed by the provisions of thisact". (Italics added.) By this language, the proviso was held to preserve rights and remedies for the redress of some specific wrong or injury given by State statute or the common law, provided the same are not inconsistent with anyrule or regulation prescribed by the act itself, a construction which merely harmonizes the provisions of the act with its purpose.
Equally untenable is the construction put upon the State statute by the appellant — that it requires all actions to be brought against the terminal carrier. This Court has expressly held that the terms of the statute limit "the loss and damage which a carrier is required to adjust and pay for to that which befalls while the goods are in the possession of such carrier, and excludes the idea of liability for loss or damage to the goods while in the possession of another carrier." Venning v. A.C.L.R. Co., 78 S.C. 56,58 S.E. 983, 12 L.R.A. (N.S.) 1217, 125 Am. St. Rep. 768.
The judgment of the Circuit Court is affirmed.
MR. CHIEF JUSTICE GARY and MR. JUSTICE FRASER concur.