# 𝖂𝖞𝖙𝖍𝖊𝖛𝖎𝖑𝖑𝖊

## Atlantic Coast Line Railroad Company, et als., v. Commonwealth of Virginia, at Relation of State Corporation Commission.

June 14, 1923.

Absent, Burks, J.

1. Interstate Commerce—*Corporation Commission—Power of the Commission to Establish Rules Governing Demurrage, Storage and Car Service and Charges Applicable to Intrastate Traffic in Virginia.*—Prior to the amendments of the act to regulate commerce by the transportation act of 1920, it was within the power of the State to make valid enactments governing demurrage, storage and car service rules, and charges applicable to intrastate traffic in Virginia, although in their operation such rules might have some effect upon interstate commerce, and hence the Corporation Commission had authority under section 3774 of the Code of 1904 to prescribe the new demurrage, storage and car service rules applicable to intrastate traffic becoming effective August 1, 1921, and the same is true since the passage of the transportation act of 1920 by Congress.

2. Interstate Commerce—*Corporation Commission—Power of Commission to Establish Car Service Rules—Constitutionality of Rules Established by Commission May 20, 1921—Appeal and Error—Necessity of Concrete Case.*—After the termination of Federal control, the State Corporation Commission, pursuant to the laws of Virginia, promulgated new demurrage, storage and car service rules applicable to intrastate commerce, and from this action defendants appealed, asserting that the commission was without power to do more than to apply the national rules to intrastate commerce, and claiming that the differences between the two sets of rules in effect created discriminations against interstate commerce. The rules prescribed by the State Corporation Commission were twenty in number and filled thirty-one pages of the record.

   *Held:* That because there might be requirements in the rules which would, in their operation, deny substantial rights of the carrier, or in some way discriminate against interstate commerce, in the absence of evidence tending to show such discrimination the Supreme Court

of Appeals would not condemn the rules as a whole or attempt to select specific provisions which, if improperly construed, might lead to unlawful discrimination, but would leave the constitutional questions raised to be determined when and if concrete cases should arise in which it might be claimed that some substantial right was denied.

3. INTERSTATE COMMERCE—*Supremacy of Federal Laws—Invalidity of State Laws.*—The supremacy of Federal control for the purpose of exercising the power to regulate interstate commerce is fully conceded, and if a State statute or rule of the State Corporation Commission, in the particular instance involved, attempts to transcend the limited field in which the State law is operative, then to that extent it is invalid.

4. INTERSTATE COMMERCE—*Carriers—Rules and Regulations of State Corporation Commission—Conflict with Federal Laws—Section 153 of the Constitution of 1902.*—In Virginia every rate, rule or regulation of the State Corporation Commission applicable to carriers must be read in connection with section 153 of the Constitution of 1902, which declares that "The provisions of this article shall always be so restricted in their application as not to conflict with any of the provisions of the Constitution of the United States, and as if the necessary limitation upon their interpretation has been herein expressed in each case."

5. INTERSTATE COMMERCE—*Corporation Commission—Car Service Rules of May 20, 1921.*—The limitation of section 153 of the Constitution of 1902 must be read into each of the storage, car service and demurrage rules of the State Corporation Commission effective August 1, 1921. So construed in concrete cases as they arise, the rules will not conflict with the Federal power or deny any substantial right of the carriers.

6. INTERSTATE COMMERCE—*Carriers—Construction of State Laws as Applicable only to Intrastate Commerce.*—An act of a State legislature, in the absence of a different construction by the State courts, must be construed as applying to transportation exclusively intrastate, and hence not in contravention of the commerce clause of the Federal Constitution.

7. INTERSTATE COMMERCE—*Corporation Commission—Validity of Car Service Rules of May 20, 1921—Case at Bar.*—In the instant case it was asserted by appellants that the Virginia car service rules of May 20, 1921, created an undue and unreasonable preference in favor of intrastate commerce in Virginia over interstate commerce in contravention of clauses 3 and 4 of section 13 of the act to regulate commerce,

and of the transportation act of 1920. There was no adequate evidence in the record to sustain this assertion, which was based apparently upon the mere fact that there were certain differences between the charges and the time allowed under the national rules applicable to interstate commerce and the proposed State rule.

*Held:* That the assignment of error based upon this assertion was without merit.

8. INTERSTATE COMMERCE—*Corporation Commission—Validity of Car Service Rules of May 20, 1921—Investigation by Interstate Commerce Commission—Case at Bar.*—Under the amendments in the transportation act of 1920, the enlarged regulatory jurisdiction of the Interstate Commerce Commission was expressly conditioned upon an investigation and finding by that Commission. There had never been any such investigation of the Virginia car service rules of May 20, 1921, and therefore there is no justification for the assumption that the mere existence of these rules, whether considered separately or collectively, creates an undue and unjust burden, in the absence of such a finding as is required under the amendments. (U. S. Comp. Stat. 1923, section 8581.)

9. INTERSTATE COMMERCE—*Interstate Commerce Commission—Effect of Delegation of Power to Commission upon Power of the State.*—A mere grant by Congress to the Interstate Commerce Commission of certain national powers in respect to interstate commerce does not of itself, and in the absence of action by the commission, interfere with the authority of the State to make regulations conducive to the welfare and convenience of its citizens. In other words, the mere creation of the Interstate Commerce Commission and the grant to it of a large measure of control over interstate commerce does not, in the absence of action by it, change the rule that Congress by non-action leaves power in the States over merely incidental matters.

10. INTERSTATE COMMERCE—*Construction of Federal Statute—Presumption in Favor of Reserved Powers of State—Conflict Between Order of Commission and State Statute.*—In construing Federal statutes enacted under the power conferred by the commerce clause of the Constitution, the rule is that it should never be held that Congress intends to supersede or suspend the exercise of the reserved powers of a State, even where that may be done, unless, and except so far as, its purpose to do so is clearly manifested. This being true, an order of a subordinate agency, such as a commission, should not be given precedence over a State rate statute otherwise valid, unless, and except so far as, it conforms to a high standard of certainty.

11. INTERSTATE COMMERCE—*Corporation Commission—Presumption in Favor of Car Service Rules of May 20, 1921.*—There is a presumption that the car service rules of May 20, 1921, having been approved by the State Corporation Commission vested with jurisdiction to investi-

gate, consider, determine and legislate, are fair, just and reasonable, and this presumption cannot be overcome by the voluntary action of the carriers in publishing rules which differ in some particulars, which may be voluntarily altered by the carriers and which upon investigation by the Interstate Commerce Commission may prove to be unequal, unjust and discriminative against both classes of commerce.

12. Interstate Commerce—*Action by Congress—Action Interstate Commerce Commission.*—When Congress does act directly and prescribes rules of action for the carriers, as in the safety appliance acts, the employers' liability act and many others, which in express language embody the direct mandate of Congress, the power has thus been legally exercised and is paramount. On the other hand, where Congress simply refers the matter to the Interstate Commerce Commission, vesting it with jurisdiction to complete the legislative act, it is otherwise, because the conditionally authorized action is obviously incomplete. The Federal government has not effectively asserted its unquestioned power until the Commission has legally exercised the legislative authority delegated to it by the Congress. Thus, the mere vesting of jurisdiction in the Interstate Commerce Commission to enact car service rules does not immediately supersede all State statutes and destroy all State power.

13. Interstate Commerce—*State Corporation Commission—Car Service Rules of May 20, 1921.*—There is a presumption that the car service rules, prescribed under the police and legislative powers of the State, are valid; that they were not intended to impose any direct burden upon interstate commerce, and will not be so construed. Mere differences in the charges authorized on interstate and intrastate traffic are not alone sufficient to overcome this presumption. The discrimination against interstate commerce must be affirmatively shown.

14. Interstate Commerce—*Jurisdiction of State—Jurisdiction of Interstate Commerce Commission.*—Although the jurisdiction of the Interstate Commerce Commission is relatively large and that of the States relatively limited, the powers of the States within their circumscribed field unquestionably exist. This field in which the powers of the States can still be freely exercised is expressly and by irresistible implication excluded from the operation of the Federal statutes.

15. Interstate Commerce—*State and Federal Jurisdiction—Congress Occupying Entire Field.*—In order to displace State legislation, which is otherwise valid, something more is necessary than an apparent intention to occupy the entire field whenever illegal discrimination created by State legislation against interstate commerce is found to exist. This for the fundamental reason that the prescribing of such rules to control future conduct is essentially a legislative

function, and until the Congress, or its duly authorized agency, the Interstate Commerce Commission, has found such discrimination to exist, and prescribed such rules, there is no occupation of the field by Federal legislation.

16. INTERSTATE COMMERCE—*State Corporation Commission—Validity of Car Service Rules of May 20, 1921—Case at Bar*—The car service rules of May 20, 1921, challenged by defendants in the instant case invade no field already occupied by Federal regulation, for there is as yet only an unexecuted legislative purpose, but no such completed legislative act which whenever legally executed will abrogate conflicting State laws otherwise valid. Unless and until the Federal commission finds the discrimination to exist, and then exercises its lawful jurisdiction, there is no effective Federal legislative action governing storage, demurrage and car service which contravenes these State rules.

Appeal from an order of the State Corporation Commission.

*Affirmed.*

The opinion states the case.

*Wm. B. McIlwaine, E. R. Williams* and *Henry Taylor, Jr.,* for the appellants.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General, Leon M. Bazile, Second Assistant Attorney-General,* and *Mason Manghum,* for the Commonwealth.

PRENTIS, J., delivered the opinion of the court.

This proceeding involves the proposed demurrage, storage and car service rules and charges applicable to intrastate traffic in Virginia, which by order of the State Corporation Commission were to become effective August 1, 1921. After the termination of Federal control, the State Corporation Commission, pursuant to the laws of the State of Virginia, issued notice to forty common carriers by rail and water of its purpose

to consider the prescription of new demurrage, storage and car service rules applicable to intrastate traffic, as required by Code, section 3774.

The defendants appeared and asked that the national demurrage and storage rules, and supplements, applicable to interstate traffic, be adopted and applied also to intrastate traffic. These national rules are formulated, and from time to time changed as experience shows to be expedient, by a demurrage committee of the American Railway Association (officials and agents representing the carriers) and a similar committee of the National Industrial Traffic League (which is an association representing a large number of shippers). At the hearing the defendant carriers were invited to sumit evidence indicating the reasons for their objections to the rules which were proposed by the Virginia Commission for intrastate business. In effect, they declined to do so, but have consistently claimed that the Virginia Commission is without power to do more than to apply the national rules to intrastate traffic, claiming that the proposed distinctions or differences between the two sets of rules will, in effect, create discriminations against interstate commerce, which are prohibited by the Federal statutes.

The Commission rejected this view, and finally adopted the rules and regulations here challenged, after making substantial changes in those which were originally proposed. From that action this appeal is taken by twelve of the larger railway companies doing interstate business in Virginia.

The question presented by the errors assigned and the arguments of counsel, assumes two aspects, which should be considered separately: First, as to whether these rules were within the police power of the State, as it existed prior to the amendments of the act to

regulate commerce by the transportation act of 1920, (41 Stat. 456); and, if so, secondly, whether this authority of the State has been rescinded and by that legislation hereafter denied.

[1] 1. In the first aspect stated, it seems to us that it is only necessary to direct attention to a previous decision of this court, *Atlantic Coast Line Railroad Co.* v. *Commonwealth*, 102 Va. 599, 46 S. E. 911. There the storage, demurrage and car service rules which had been prescribed by the Virginia Commission were under review by this court on appeal. We refer to it as expressing our views upon this aspect of the question. Having there held, and supported the view by the impregnable authority of the Supreme Court of the United States, that it is within the power of the State to make such valid enactments in the exercise of its legislative power to promote the welfare and convenience of its citizens, although in their operation they may have some effect upon interstate commerce, and hence that the Commission had the authority to prescribe those rules, this is said:

"It is impossible for us on this appeal to make a wholesale exposition of the constitutionality of the rules and regulations in question, so far as they may, in their varied application and enforcement, affect the rights of persons and corporations engaged in interstate and foreign shipments and transportation, or violate rights protected by the Federal Constitution. To hold that they are invalid, so far as they apply to interstate and foreign commerce, as the appellants insist should be done, might have the effect of depriving the State of her undoubted right, under her reserved powers, to make provisions for the purpose of enforcing the obligations of transportation companies to accommodate the public, and for regulating the relative rights and duties of

all persons and corporations within its jurisdiction, and, therefore, to provide for the public convenience and the public good, when such regulations are in aid of, or only incidentally affect, interstate commerce, and do not violate any right protected by the Constitution of the United States. To hold, on the other hand, that the rules would not, in their operation, directly intrench upon the authority of the United States, nor violate any right protected by the Federal Constitution, might result in our denying transportation companies and others their just rights under the Constitution and laws of the United States, and drive them to the Federal courts for the assertion and maintenance of rights which ought to be guarded and enforced by the courts of the State, whose government they support, and from which they are entitled to protection. For these and other reasons, which might be given, we are of opinion that we ought not, upon this appeal, to attempt to decide to what extent, if at all, the said rules and regulations, in their operation, may directly infringe upon the commerce clause of the Constitution of the United States, or violate any right of the appellants under that instrument, and that the decision of those questions can only be properly made as they arise in concrete cases, and upon the particular facts of each case."

[2] The rules prescribed and here now under review are twenty in number, with many subsections, and fill thirty-one pages of the printed record. Many of their provisions are identical with the national rules which the carriers prefer, and we are here asked to condemn and reverse the action of the Commission because there may be requirements which will, in their operation, deny some substantial right of the carriers, or in some way discriminate against interstate commerce. We decline to do this in the absence of evidence tending to

show such discrimination. If we were to attempt to select those specific provisions, which if improperly construed and applied might possibly lead to such unlawful discrimination, we would have to do so with few if any helpful suggestions from the carriers. Our conclusion, therefore, is that we will not delay the enactment of these rules, but will leave the constitutional questions raised, which are not now decided, to be determined when and if concrete cases shall hereafter arise in which it may be claimed that some substantial right is denied. That this remedy is sufficient and efficient has already been demonstrated.

The case of *Southern Railway Co.* v. *Commonwealth,* 107 Va. 771, 60 S. E. 70, 17 L. R. A. (N. S.) 364, involved one of the rules which had been under review in the case previously cited. A shipper desiring cars to be delivered to him at a Virginia station for an interstate shipment sought to recover from a carrier who had failed to furnish the cars in the quantity or within the time prescribed the charges imposed by one of those rules. The carrier defended upon the ground that the rule imposed an unreasonable burden on interstate commerce, and was in conflict with the act to regulate commerce. The Commission declined to sustain this defense, but upon appeal their judgment imposing a fine upon the carrier was reversed, and the rule was held to be inapplicable under such circumstances.

Precisely the same principle was applied and the soundness of this view confirmed by the Supreme Court of the United States at a later date in *Southern Ry. Co.* v. *Reid,* 222 U. S. 424, 32 Sup. Ct. 140, 56 L. Ed. 257. There a statute of North Carolina penalizing the refusal of a carrier to accept the tender of an interstate shipment, where no rate for such a shipment had been established, filed or published, was held inapplicable.

This statute was doubtless perfectly valid as to intrastate shipments, but could not be construed to extend to interstate shipments, because so to apply it would be to impose a direct burden upon interstate commerce, which exceeds the power of the State.

So, likewise, in the case of *St. Louis, Southwestern R. Co.* v. *Arkansas*, 217 U. S. 136, 30 Sup. Ct. 476, 54 L. Ed. 699, 29 L. R. A. (N. S.) 802. There an Arkansas statute required the carrier to supply cars to shippers on demand, and imposed a penalty for failure to do so. The carrier defended upon the ground that it was impossible for it to do so without ceasing the interchange of its cars with connecting lines for the purpose of moving interstate commerce in accordance with the rules and regulations adopted for the interchange of cars by the American Railway Association, these rules governing 90% of the railways of the United States. It was held that the State statute, as construed by the State court, imposed a direct burden upon interstate commerce, and because of this was invalid under the circumstances of that particular case. This, however, does not deny the validity of the statute when applied only to intrastate commerce and no burden is thereby imposed upon interstate commerce.

[3-5] The supremacy of Federal control for the purpose of exercising the power to regulate interstate commerce, must be and is fully conceded, and if the State statute or rule, in the particular instance involved, does attempt to transcend the limited field in which the State law is operative, then to this extent it is invalid. In this State, however, every rate, rule or regulation of this character must be read in connection with the express inhibition of the Virginia Constitution, section 153, which is the article creating the State Corporation Commission, and defining its powers and duties. There

it is expressly declared that "The provisions of this article shall always be so restricted in their application as not to conflict with any of the provisions of the Constitution. of the United States, and as if the necessary limitation upon their interpretation has been herein expressed in each case." This limitation so frankly expressed, and which exists without such an expression, must be read into each of the storage, car service and demurrage rules which are here involved. So construed in concrete cases as they arise, the rules will not conflict with the Federal power or deny any substantial right of the carriers.

[6] Confirming this, we find that in *McCabe* v. *Atchison, etc., R. Co.,* 235 U. S. 151, 59 L. Ed. 174, 35 Sup. Ct. 69, it is expressly held that an act of a State legislature, in the absence of a different construction by the State courts, must be construed as applying to transportation exclusively intrastate, and hence not in contravention of the commerce clause of the Federal Constitution. Several supporting cases are there cited.

2. Having restated this conclusion, we consider the second aspect of the question presented, which appears to be most seriously relied on. The contention is thus stated in the third and fourth assignments of error:

Assignment 3: "The necessary effect of the said rules, if carried into operation, will be to create an undue and unreasonable preference in favor of intrastate commerce in Virginia over interstate commerce as between Virginia and other States and as between other States, and to create an undue and unjust burden on interstate commerce, in contravention of the act to regulate commerce and the acts of Congress, amendments thereto, and particularly in contravention of clauses 3 and 4 of section 13 of said act to regulate commerce, and of the transportation act, 1920."

Assignment 4: "By clauses 10, 13 and 14 of section 1 of the interstate commerce act, as amended by the transportation act, 1920, and by other sections of the said interstate commerce act, the Congress of the United States has evidenced its intention to occupy the entire field of legislation in respect of the matters covered by the rules promulgated by the said order of May 20, 1921, here complained of, and in view of this intention of Congress so expressed, the State Corporation Commission of Virginia is without power to make rules in respect of this subject."

[7] As to the violation of clauses 3 and 4 of section 13 of the act to regulate commerce, as amended,* it seems to us sufficient to say that the assignment is a mere assertion, for the support of which we find no adequate evidence in this record. It is based apparently upon the bare fact that there are certain differences between the charges and the time allowed under the national rules, published by the carriers, applicable to interstate traffic, and the proposed State rules applicable to intrastate traffic. There is no evidence as to

---

*"(3) Whenever in any investigation under the provisions of this Act, or in any investigation instituted upon petition of the carrier concerned, which petition is hereby authorized to be filed, there shall be brought in issue any rate, fare, charge, classification, regulation, or practice, made or imposed by authority of any State, or initiated by the President during the period of Federal control, the Commission, before proceeding to hear and dispose of such issue, shall cause the State or States interested to be notified of the proceeding. The Commission may confer with the authorities of any State having regulatory jurisdiction over the class of persons and corporations subject to this act with respect to the relationship between rate structures and practices of carriers subject to the jurisdiction of such State bodies and of the Commission; and to that end is authorized and empowered, under rules to be prescribed by it, and which may be modified from time to time, to hold joint hearings with any such State regulating bodies on any matters wherein the Commission is empowered to act and where the rate-making authority of a State is or may be affected by the action taken by the Commission. The Commission is also authorized to avail itself of the co-operation, services, records and facilities of such State authorities in the enforcement of any provision of this Act.

"(4) Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice, causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding."

the volume of either class of traffic, and nothing to show which, if either, are the just and reasonable charges, or in what respect these differences will create unlawful discriminations, other than the mere fact that in some instances they differ in amount. These differences appear to us to be inconsequential, and it is stated in the briefs filed for the Commonwealth that since the date of the order appealed from, the demurrage charges allowed for delays in unloading carload shipments and in receiving less than carload shipments, under the national rules, have been voluntarily reduced in several of the instances complained of, so that they are now equal in amount to those proposed in the rules under review. In one instance, under the national rules, the charge has been reduced below that authorized under these rules. This, of course, does not relate to the charges which are imposed by the State statutes upon the carriers for delays in furnishing cars to prospective shippers upon notice and demand, for the national rules provide for no such exactions.

[8] It is also observed that under the amendments relied on in the transportation act, 1920, the enlarged regulatory jurisdiction of the Interstate Commerce Commission is expressly conditioned upon an investigation and finding by that Commission, without which no such increased jurisdiction is conferred by any section of the act. As there has never been any such investigation of the Virginia rules, it seems to us clear that there is no justification for the assumption that the mere existence of these rules, whether considered separately or collectively, creates an undue and unjust burden on interstate commerce, in the absence of such a finding as is required under the amendments (U. S. Comp. Stat. Compact Ed. Supp. 1923, sec. 8581).

Then, in order to determine the substance of both

assignments, we must of course look to the act itself, and the decisions of the Supreme Court of the United States construing it.\* When so examined and considered, both the statute and the decisions construing it appear to us conclusively to deny the contention. Under the act before these latest amendments, these cases unequivocally deny the construction which we are asked to place upon the amendments.

*Cooley* v. *Port Wardens*, 12 How. 299, 13 L. Ed. 996, was a case involving the regulation of pilots and pilotage, which was held to be a regulation of commerce within the granting of power to Congress, but this is there said: "The mere grant of such a power to Congress did not imply a prohibition on the States to exercise the same power; that it is not the mere existence of such a power, but its exercise by Congress, which may be incompatible with the exercise of the same power by the States, and that the States may legislate in the absence of congressional regulations." *Sturgis* v. *Crowninshield*, 4 Wheat. 193, 4 L. Ed. 548; *Houston* v. *Moore*, 5 Wheat. 1, 5 L. Ed. 19; *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pet. 251, 7 L. Ed. 414.

It is upon this principle that the case of *Missouri Pac. R. Co.* v. *Larabee Flour Mills Co.*, 211 U. S. 612, 29 Sup. Ct. Rep. 214, 53 L. Ed. 352, was determined. There a mandamus was issued requiring the carrier to discharge

---

\*Section 1 of the interstate commerce act, as amended by the transportation act, 1920, in clauses (10), (13) and (14), is as follows:

"(10) The term 'car service' in this act shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property, including special types of equipment and the supply of trains, by any carrier by railroad subject to this act.

"(13) The Commission is hereby authorized by general or special orders to require all carriers by railroad subject to this act, or any of them, to file with it from time to time their rules and regulations with respect to car service, and the Commission may, in its discretion, direct that such rules and regulations shall be incorporated in their schedules showing rates, fares, and charges for transportation, and be subject to any or all of the provisions of this act relating thereto."

"(14) The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations and practices with respect to car service by carriers by railroad subject to this act, including the compensation to be paid for the use of any locomotive, car or other vehicle not owned by the carrier using it, and the penalties or other sanctions for non-observance of such rules, regulations or practices."

its common law duty to treat all shippers alike by the transfer and return of cars loaded and unloaded to be used both in interstate and intrastate commerce. It was claimed that this action was illegal because Congress had delegated to the Interstate Commerce Commission certain national power over interstate commerce, which prevented a State from making regulations conducive to the welfare and convenience of its own citizens which might indirectly affect interstate commerce. Mr. Justice Brewer, in denying this contention, after citing many precedents in which State laws had been upheld which indirectly affected interstate commerce, says:

[9] "On the other hand, it is said that Congress has already acted—has created the Interstate Commerce Commission, and given to it a large measure of control over interstate commerce. But the fact that Congress has instrusted power to that Commission does not, in the absence of action by it, change the rule which existed prior to the creation of the Commission. Congress could always regulate interstate commerce, and could make specific provisions in reference thereto, and yet this has not been held to interfere with the power of the State in these incidental matters. A mere delegation by Congress to the Commission of a like power has no greater effect, and does not of itself disturb the authority of the State. It is not contended that the Commission has taken any action in respect to the particular matters involved. It may never do so, and no one can, in advance, anticipate what it will do when it acts. Until then the authority of the State in merely incidental matters remains undisturbed. In other words, the mere grant by Congress to the Commission of certain national powers in respect to interstate commerce does not of itself, and in the absence of action by

the Commission, interfere with the authority of the State to make those regulations conducive to the welfare and convenience of its citizens. Running through the entire argument of counsel for the Missouri Pacific is the thought that the control of Congress over interstate commerce and a delegation of that control to a commission, necessarily withdraws from the State all power in respect to regulations of a local character. This proposition cannot be sustained. Until specific action by Congress or the Commission, the control of the State over these incidental matters remains undisturbed. But it is further contended that this is not a mere incidental matter, indirectly affecting interstate commerce, but directly a part of such commerce, and therefore beyond the power of the State to control; and in support of that *McNeill* v. *Southern Ry. Co.*, 202 U. S. 543, 50 L. Ed. 1142, 26 Sup. Ct. Rep. 722, is referred to. There are many points of resemblance between that case and this, but there is this substantial distinction: In that was presented and determined solely the power of a State Commission to make orders respecting the delivery of cars engaged in interstate commerce beyond the right of way of the carrier and to a private siding— an order which affected the movement of the cars prior to the completion of the transportation; while here is presented, as heretofore indicated, the question of the power of the State to prevent discrimination between shippers, and the common law duty resting upon a carrier was enforced. This common law duty the State, in a case like the present, may—at least in the absence of congressional action—compel a carrier to discharge.'"

This view is also expressed in *Southern Ry. Co.* v. *Reid*, 222 U. S. 424, 32 Sup. Ct. 140, 56 L. Ed. 257. There it was held that Congress has so completely taken control of rate making, by the provisions of the act to

regulate commerce, as to invalidate a North Carolina statute which undertook to penalize the refusal of a carrier to receive a tender of freight for transportation to a point on the line of another carrier outside of the State where no rate for such shipment had ever been established, filed or published, and this is said: "It is well settled that if the State and Congress have a concurrent power, that of the State is superseded when the power of Congress is exercised. The question occurs: To what extent and how directly must it be exercised to have such effect? It was decided in *Missouri P. R. Co.* v. *Larabee Flour Mills Co.*, 211 U. S. 612, 53 L. Ed. 352, 29 Sup. Ct. Rep. 214, that the mere creation of the Interstate Commerce Commission and the grant to it of a large measure of control over interstate commerce does not, in the absence of action by it, change the rule that Congress by non-action leaves power in the States over merely incidental matters. * * * The principle of that case, therefore, requires us to find specific action either by Congress in the interstate commerce act, or by the Commission, covering the matters which the statute of North Carolina attempts to regulate. There is no contention that the Commission has acted, so we must look to the act. Does it, as contended by the plaintiff in error, take control of the subject matter and impose affirmative duties upon the carriers which the State cannot even supplement? In other words, has Congress taken possession of the field?"

To this view the court continues to adhere, and in *Atlantic Coast Line R. Co.* v. *Georgia*, 234 U. S. 292, 58 L. Ed. 1318, 34 Sup. Ct. Rep. 829, upholding the validity of a Georgia statute requiring that railway locomotives running on the main line shall be equipped with headlights of a certain power, says, referring to acts of Congress relating to locomotives: "But it is manifest

that none of these acts provides regulations for locomotive headlights. Attention is also called to the investigations conducted by what is known as the 'block signal and train control board' (organized by the Commission), and the reports of that board with respect to sundry devices and appliances, including headlights. It does not appear, however, either that Congress has acted, or that the Commission, under the authority of Congress, has established any regulation so far as headlights are concerned. As to these the situation has not been altered by any exertion of Federal power, and the case stands as it has always stood, without regulation, unless it be supplied by local authority. The most that can be said is that inquiries have been made, but that Congress has not yet decided to establish regulations, either directly or through its subordinate body, as to the appliance in question. The intent to supersede the exercise of the State's police power with respect to this subject cannot be inferred from the restricted action which thus far has been taken."

Referring to a contention that a Texas statute allowing an attorney's fee upon the successful prosecution of a claim against a carrier based upon the loss of freight shipped in interstate commerce was invalid, the court in *Missouri K. & T. R. Co.* v. *Harris*, 234 U. S. 412, 58 L. Ed. 1381, 34 Sup. Ct. 790, L. R. A. 1915 E, 942, says this: "But the 'act to regulate commerce' (act of February 4, 1887, 24 Stat. at L. 379, chap. 104, U. S. Comp. Stat. 1901, p. 3154) is now invoked, together with its amendments, and especially that part of the Hepburn act of June 29, 1906, known as the Carmack amendment (34 Stat. at L. 564, 595, chap. 3591, U. S. Comp. Stat. Supp. 1911, pp. 1288, 1307); and it remains to be considered whether the Texas statute, as applied to claims for loss or damage to interstate freight while in

the possession of the carrier in the State of Texas, is repugnant to this Federal legislation. It is, of course, settled that when Congress has exerted its paramount legislative authority over a particular subject of interstate commerce, State laws upon the same subject are superseded." (Citing cases.) "* * * But it is equally well settled that the mere creation of the Interstate Commerce Commission, and the grant to it of a measure of control over interstate commerce, does not of itself, and in the absence of specific action by the Commission or by Congress itself, interfere with the authority of the States to establish regulations conducive to the welfare and convenience of their citizens, even though interstate commerce be thereby incidentally affected, so long as it be not directly burdened or interfered with."

[10] One of the fundamental rules governing questions of this character is thus stated in *Illinois Cent.* v. *Public Utilities Commission,* 245 U. S. 510, 62 L. Ed. 438, 38 Sup. Ct. 170: "In construing Federal statutes enacted under the power conferred by the commerce clause of the Constitution, the rule is that it should never be held that Congress intends to supersede or suspend the exercise of the reserved powers of a State, even where that may be done, unless, and except so far as, its purpose to do so is clearly manifested. *Reid* v. *Colorado,* 187 U. S. 137, 148, 47 L. Ed. 108, 114, 23 Sup. Ct. 92, 12 Am. Cr. Rep. 506; *Cummings* v. *Chicago,* 188 U. S. 410, 430, 47 L. Ed. 525, 531, 23 Sup. Ct. 472; *Savage* v. *Jones,* 225 U. S. 501, 56 L. Ed. 1182, 32 Sup. Ct. 715; *Missouri, K. & T. Ry. Co.* v. *Harris,* 234 U. S. 412, 419, 58 L. Ed. 1377, 1382, 34 Sup. Ct. 790, L. R. A. 1915 E, 942. This being true of an act of Congress, it is obvious that an order of a subordinate agency, such as the Commission, should not be given precedence over a State

rate statute otherwise valid, unless, and except so far as, it conforms to a high standard of certainty."

This, of course, leads us again to the statute, to determine whether Congress has in fact occupied the entire field in respect to car service rules. We find the express inhibition that in construing the act as a whole it shall not apply "To the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one State and not shipped to or from a foreign country from or to any place in the United States as aforesaid; * * *" Transportation act, 1920, U. S. Comp. Stat. 1923, sec. 8563 (2), (a).

Then these amendments to the act to regulate commerce, U. S. Comp. Stat. 1923, secs. 8581 and 8583, provide that before the Federal Commission shall condemn or supersede any rate, fare, charge classification, regulation, or practice, made or imposed by authority of any State, the State interested shall be notified, and that the Commission may confer with the State authorities or officials having regulatory jurisdiction over the corporations subject to the act, and for joint hearings by the Federal and State officials, and that before condemning any intrastate rate, rule or statute, the Federal Commission must after full hearing first find that such rate, rule, or statute causes such "undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand," etc. It is only after such fact is found that the Federal Commission is given plenary authority to correct the illegality and injustice thereby caused.

In section 1 of the act, as amended, U. S. Comp. Stat. 1923, sec. 8563 (17), referring directly to the provisions relating to car service, we find the jurisdiction

of the State again recognized by this proviso: "That nothing in this act shall impair or affect the right of a State, in the exercise of its police power, to require just and reasonable freight and passenger servicef or intrastate business, except in so far as such requirement is inconsistent with any lawful order of the Commission made under the provisions of this act." It is apparent, then, that the precise power here asserted by the State, which is recognized as previously existing, is expressly preserved.

We also find that the statute relied on to show an extension of the Federal power and a corresponding restriction of the State power is an uncompleted legislative act. There is here no completed legislative action by the Congress until and except after the Federal Commission has exercised the new jurisdiction conferred.

Since these amendments became effective, there have been two instructive cases construing them.

In *Railroad Commission of Wisconsin* v. *Chicago, B. & Q. R. Co.*, 257 U. S. 563, 42 Sup. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086, decided February 27, 1922, this appears: A statute of Wisconsin prescribed a maximum intrastate passenger rate of two cents a mile, so that when the State Railroad Commission was asked to increase that rate to 3.6 cents per mile, that being the rate which the Interstate Commerce Commission had, in the proceeding known as *Ex Parte 74 Increased Rates*, 58 I. C. C. Rep. 220, found to be just and reasonable, the Wisconsin Commission feeling bound by the State statute refused to do so. It was also shown that in a proceeding known as the *Wisconsin Passenger Fares*, there had been an investigation by the Interstate Commerce Commission, as authorized by the transportation act of 1920, into the undue and unreasonable restraint of

interstate commerce arising out of the intrastate rates in Wisconsin. The Federal Commission found that this undue and unreasonable discrimination against interstate commerce existed, and that if the two-cent passenger fare prescribed by the State statute should be continued, the income of the carriers in that State would be six million dollars per year less than if the rate prescribed by the Commission, 3.6 cents per mile, was applied. The carriers filed bills in equity to enjoin the State Railroad Commission from interfering with the maintenance of passenger fares thus ordered by the Federal Commission to be published. The opinion states that there were two questions to be decided:

"First. Do the intrastate passenger fares work undue prejudice against persons in interstate commerce, such as to justify a horizontal increase of them all?

"Second. Are these intrastate fares an undue discrimination against interstate commerce as a whole which it is the duty of the Commission to remove?"

The court (through Mr. Chief Justice Taft) answers the first question in the negative, upon the ground that the order was very much wider in its scope than was justified, saying, among other things: "The report of the Commission showed discrimination against persons and localities at border points, and the orders were extended to include all rates or fares from all points in the State to border points. But this order is not so restricted. It includes fares between all interior points although neither may be near the border and the fares between them may not work a discrimination against interstate travelers at all. Nothing in the precedents cited justifies an order affecting all rates of a general description when it is clear that this would include many rates not within the proper class or the reason of the order."

The court answers the second question, however, in the affirmative, upon the ground that it was shown that the net income of the interstate carriers of the State would be six millions of dollars less than it would be if intrastate rates on the same level with interstate rates were allowed, and that such a reduction and disparity create an undue, unreasonable and unjust discrimination against interstate or foreign commerce, which the Commission may remove by raising the intrastate fares. This construction is based on that section which authorizes the Commission to prescribe rates, so as to enable the carriers, as a whole, to earn an aggregate annual net railway operating income equal to fair return upon the aggregate value of the railway property used in transportation. In answer to one of the objections, this is said: "It is objected here, as it was in the *Shreveport Case*, that orders of the Commission which raise the intrastate rates to a level of the interstate structure, violate the specific proviso of the original interstate commerce act, repeated in the amending acts, that the Commission is not to regulate traffic wholly within a State. To this the same answer must be made as was made in the *Shreveport Case*, 234 U. S. 342, 358, 34 Sup. Ct. 833, 58 L. Ed. 1341, that such orders as to intrastate traffic are merely incidental to the regulation of interstate commerce and necessary to its efficiency. Effective control of the one must embrace some control over the other in view of the blending of both in actual operation. The same rails and the same cars carry both. The same men conduct them. Commerce is a unit and does not regard State lines and while, under the Constitution, interstate and intrastate commerce are ordinarily subject to regulation by different sovereignties, yet when they are so mingled together that the supreme authority, the nation, cannot exercise complete effective

control over interstate commerce without incidental regulation of intrastate commerce, such incidental regulation is not an invasion of State authority or a violation of the proviso."

The opinion clearly recognizes the right of the State to regulate intrastate commerce, unrestricted by Federal legislation, so long as the State legislation does not conflict with the Federal power, and this is clearly expressed in this paragraph: "It is said that our conclusion gives the Commission unified control of interstate and intrastate commerce. It is only unified to the extent of maintaining efficient regulation of interstate commerce under the paramount power of Congress. It does not involve general regulation of intrastate commerce. Action of the Interstate Commerce Commission in this regard should be directed to substantial disparity which operates as a real discrimination against, and obstruction to, interstate commerce, and must leave appropriate discretion to the State authorities to deal with intrastate rates as between themselves on the general level which the Interstate Commerce Commission has found to be fair to interstate commerce. * * * So, too, in practice, when the State Commissions shall recognize their obligation to maintain a proportionate and equitable share of the income of the carriers from intrastate rates, conference between the Interstate Commerce Commission and the State Commissions may dispense with the necessity for any rigid Federal order as to the intrastate rates, and leave to the State Commissions power to deal with them and increase them or reduce them in their discretion."

On the same day the case of *New York* v. *United States*, 257 U. S. 591, 42 Sup. Ct. 239, 66 L. Ed. 244, was decided. Unlike the *Wisconsin Case*, which was a suit of a railroad company against the Railroad Commission,

this was a suit instituted by the State of New York against the United States, the Interstate Commerce Commission, and others. It involved substantially the same questions, though the precise issues were different. The evidence there showed that if the two-cent passenger rate prescribed by the New York statute were continued in force, the annual gross revenues of interstate railroads operating in New York from the passenger and milk business would be less by nearly twelve millions of dollars than those revenues would be if the intrastate fares and rates were on the same level as the interstate rates fixed by the Interstate Commerce Commission. It was held for the same reasons as those stated in the *Wisconsin Case* that this constituted an undue, unreasonable and unjust discrimination against interstate commerce, which the Federal Commission was authorized to remove by raising the intrastate rates. It is observed that in both of these cases the Interstate Commerce Commission had already exercised the jurisdiction which the transportation act conferred, had made an investigation, after which it had ascertained and declared that the State statutes relied on were in conflict with the Federal statutes involved. This is true also of the still more recent case involving rates in *Tennessee, Nashville, C. & St. L. R. Co.* v. *Tennessee*, 43 Sup. Ct. 583, 67 L. Ed. decided May 21, 1923.

[11] There has been no such investigation by the Interstate Commerce Commission of the rules here involved. There is a presumption that, having been approved by the State tribunal vested with jurisdiction to investigate, consider, determine and legislate, they are fair, just and reasonable. This presumption cannot be overcome by the voluntary action of the carriers in merely publishing rules which differ in some particu-

lars, which may be and have been voluntarily altered
by the carriers from time to time and which upon in-
vestigation by the Interstate Commerce Commission
may prove to be unequal, unjust and discriminative
against both classes of commerce.

[12] It is not necessary to cite the numerous cases in
which it has been held that when Congress does enact
effective and operative legislation, then all State laws
in conflict therewith are thereby superseded. In none
of these cases, however, is the principle to which we
have referred controverted. When Congress does act
directly and prescribes rules of action for the carriers,
as in the safety appliance acts, the employers' liability
act and many others, which in express language embody
the direct mandate of Congress, the power has thus
been legally exercised and is paramount. On the other
hand, where Congress simply refers the matter to the
Interstate Commerce Commission, vesting it with
jurisdiction to complete the legislative act, it is other-
wise, because the conditionally authorized action is
obviously incomplete. The Federal government has
not effectively asserted its unquestioned power until
the Commission has legally exercised the legislative
authority delegated to it by the Congress. If the mere
vesting of jurisdiction in the Federal Commission to
enact car service rules immediately supersedes all State
statutes and destroys all State power, and the Commis-
sion fails to act by exercising the jurisdiction so con-
ferred, then there is no control of the carriers by either
Federal or State authority. That is precisely the case
here. The Commission has not acted; the rules and
regulations applicable to interstate commerce which are
operative with reference to demurrage and car service
are voluntary rules formulated with the aid of and by
the consent of the carriers. That Congress has empow-

ered the Interstate Commerce Commission to remove all unjust discriminations against interstate commerce created by State statutes or orders regulating car service and supply is true, but this is not equivalent to direct legislative action either by the Congress or by the Commission, nor can the power be construed to authorize the carriers to ignore or nullify any State law which does not so discriminate. Congress has not empowered the carriers to act as judges for themselves to determine that their car service rules are better or more just than such rules prescribed under State authority and applicable only to intrastate business. This, however, is what we are here asked by the carriers to hold, whereas on the contrary there is every presumption in favor of the rules so prescribed and applicable to intrastate traffic.

That the Virginia Commission recognizes this supremacy of Federal power is clearly indicated in the car service rules here under review. To the rule requiring carriers promptly to furnish cars to shippers desiring and ordering them, there is an exception in this language: "This rule shall not apply to shipments of coal and coke from mines and ovens, nor to delays arising from causes not in the power of the carrier to prevent, such as Interstate Commerce Commission service orders. Delays arising from causes beyond carrier's control shall be added to and counted as additional free time. No failure of the carrier to provide the rolling stock reasonably necessary for the discharge of its public duties shall be construed to be a cause of delay not within the power of the carrier to prevent. This relates particularly to the power of the Commission under Comp. Stat. section 8563, cl. 15, authorizing the Commission, in case of emergency, to direct the distribution of railway cars.

Our conclusions, then, which determine the proceeding here, are thus summarized:

[13] 1. There is a presumption that these rules, prescribed under the police and legislative powers of the State, are valid; that they were not intended to impose any direct burden upon interstate commerce, and will not be so construed. Mere differences in the charges authorized on interstate and intrastate traffic which the carriers are to collect from those who unduly delay either the unloading of cars or the receipt of less than carload shipments, are not alone sufficient to overcome this presumption. The discrimination against interstate commerce must be affirmatively shown. This is likewise true as to the charges imposed by the State legislation on the carriers for failure promptly to supply cars for intrastate commerce, for this is a legal duty imposed upon all carriers, and such exactions operate to expedite and aid all commerce.

[14] 2. That although the jurisdiction of the Federal Commission is relatively large and that of the States relatively limited, the powers of the States within their circumscribed field unquestionably exist. This field in which the powers of the States can still be freely exercised is expressly and by irresistible implication excluded from the operation of the Federal statutes, and so these Federal statutes have been construed with consistent reiteration by the Supreme Court of the United States.

[15] 3. In order to displace State legislation, which is otherwise valid, something more is necessary than an apparent intention to occupy the entire field whenever illegal discrimination created by such State legislation against interstate commerce is found to exist. This for the fundamental reason that the prescribing of such rules to control future conduct is essentially a legisla-

6

tive function, and until the Congress, or its duly authorized agency, the Interstate Commerce Commission, has found such discrimination to exist, and prescribed such rules, there is no occupation of the field by Federal legislation.

[16] 4. The rules here challenged by the carriers invade no field already occupied by Federal regulation, for there is as yet only an unexecuted legislative purpose, but no such completed legislative act which whenever legally executed will abrogate conflicting State laws otherwise valid. Unless and until the Federal commission finds the discrimination to exist, and then exercises its lawful jurisdiction, there is no effective Federal legislative action governing storage, demurrage and car service which contravenes these State rules.

These distinctions may be difficult of application in concrete cases, but that they indubitably exist is demonstrated by the sure word of the supreme legislative and judicial power. No reversible error in the order appealed from has been shown.

*Affirmed.*