# Wytheville.

## Atlantic Coast Line Railroad Company and Others v. Commonwealth of Virginia, at the Relation of the State Corporation Commission.

### June 17, 1926.

1. CARRIERS—*Pullman Surcharge—Definition.*—The Pullman surcharge is a charge made to compensate the carrier for special additional passage service furnished passengers in sleeping and parlor cars not enjoyed by coach passengers.

2. CARRIERS—*Pullman Surcharge—Validity—Whether Additional Tax.*— The Pullman surcharge is not an additional tax which the Pullman company is permitted to extract from the people, without giving anything valuable in return. The Pullman company furnishes its patrons with service similar to hotel accommodations, such as a special chair, a compartment, a berth, a lavatory with its accessories, and, generally, with meals if desired. It is permitted to make a charge sufficient to compensate it for these services and pay a reasonable return upon its investment.

3. CARRIERS—*Pullman Surcharge—Validity—Whether Additional Tax— Removal by State Corporation Commission of the Surcharge.*—The cost to the carriers of transportation service for Pullman passengers is in excess of such costs for ordinary coach passengers and there is no merit in the contention that the Virginia Corporation Commission properly removed the Pullman surcharge on intrastate traffic because the Pullman company is under contract with the railroads to pay them ·for hauling the Pullman cars. The railroads are entitled to extra compensation for the extra cost to them of transporting Pullman passengers.

4. CARRIERS—*Pullman Surcharge—Not an Independent Third Charge upon the Passengers.*—The Pullman surcharge ought not to be regarded as an independent third charge upon the passenger. It was devised as a simple and convenient method for computing an addition to the basic passenger fare for those who ride in Pullman cars, and is thus equivalent to an increase in the rate per mile.

5. CARRIERS—*State Corporation Commission—Reduction of Intrastate Fare Below the Level of Interstate Rates.*—If the State Corporation Commission was allowed to reduce intrastate fares below the general level of the interstate rates, the result would be to break down the

interstate rates established by Federal authority. The direct effect of lowering the intrastate fares is to disrupt the interstate system of fares, and the removal by the State Corporation Commission of the Pullman surcharge has the effect of breaking down the Federal rate.

6. CARRIERS—*Interstate Commerce Commission—Regulation of Intrastate Commerce.*—The transportation act of 1920 (U. S. Comp. Stat. Ann. Supp., 1923, secs. 8581, 8583) does not give to the Interstate Commerce Commission the power to regulate intrastate commerce generally, but only in so far as may be necessary, under the paramount power of Congress, efficiently to regulate interstate commerce. The State authorities still have the power to deal with intrastate rates, on the general level which the Interstate Commerce Commission has found to be fair to interstate commerce.

7. CARRIERS—*Pullman Surcharge—Removal of the Surcharge on Intrastate Traffic.*—That two of the railroads in Virginia were earning a return in excess of that fixed by the Interstate Commerce Commission did not authorize the removal of the Pullman surcharge on intrastate traffic, by the State Corporation Commission, as U. S. Comp. Stat. Ann. Supp., 1923, sec. 10071$\frac{1}{4}$, *et seq.*, subjects the excess return in such cases to a *pro rata* re-capture for the *pro rata* benefit of all the roads of the same rate group.

8. CARRIERS—*Pullman Surcharge—Removal by State Corporation Commission—De Minimis.*—Upon appeal from an order of the State Corporation Commission discontinuing the Pullman surcharge in connection with traffic between points in the State of Virginia, it appeared that the intrastate surcharge was worth to the carriers in Virginia $100,000 a year.

*Held:* That there was no merit in the contention that the surcharge should be removed because the loss occasioned thereby to the carriers would be *de minimis.*

9. CARRIERS—*Interstate Commerce Commission—Commission Occupies the Entire Field—Intrastate Regulations Resulting in Discrimination Against Interstate Commerce.*—The Interstate Commerce Commission, acting under the paramount authority of Congress, occupies the entire field in all matters pertaining to interstate commerce and has thereby ousted the jurisdiction of the State authorities where they undertake by legislation or regulation to control intrastate transportation in a manner which results in an unjust or unreasonable discrimination against interstate commerce.

10. CARRIERS—*Interstate Commerce Commission—Regulations of Intrastate Traffic.*—Commerce is a unit and does not regard State lines, and while under the Constitution, interstate and intrastate commerce are ordinarily subject to regulation by different sovereignties, yet when they are so mingled together that the supreme authority, the Nation, cannot exercise complete effective control over interstate

commerce without incidental regulation of intrastate commerce, such incidental regulation is not an invasion of State authority or a violation of the proviso, of the original interstate commerce act, repeated in the amended act, that the commission is not to regulate traffic wholly within a State.

11. STATE CORPORATION COMMISSION—*Order of Commission Discontinuing the Pullman Surcharge in Intrastate Commerce—Validity of Order— Taking without Due Process of Law—Case at Bar.*—In the instant case the Commonwealth offered no evidence, and the record failed to disclose any evidence on behalf of the carriers, which supported the action of the State Corporation Commission in discontinuing the Pullman surcharge on intrastate traffic between points in Virginia.

*Held:* That the order of the State Corporation Commission eliminating the surcharge, and thereby depriving the carriers of $100,000 per year, was the taking of property without due process of law and was void.

Appeal from an order of the State Corporation Commission.

*Reversed.*

The opinion states the case.

*William B. McIlwaine, H. G. Morison, Henry Taylor, Jr., W. A. Northcutt, Henry Wolf Bikle, W. B. Rodman, Lucien H. Cocke, R. B. Gwathmey, Charles J. Rixey, Jr., W. H. T. Loyall, H. G. Buchanan* and *Wirt P. Marks, Jr.,* for the appellants.

*John R. Saunders, Atty. Gen.,* and *Leon M. Bazile, Lewis H. Machen* and *Mason Manghum, Asst. Attys. Gen.,* for the Commonwealth.

WEST, J., delivered the opinion of the court.

This is an appeal from an order of the Virginia State Corporation Commission, requiring the appellant carriers by railroad, operating between points in the State of Virginia, including the Pullman company, to "discontinue applying the Pullman surcharge in connection with traffic between points in the State of Virginia."

[1] The Pullman surcharge is a charge made to compensate the carrier for special additional passage service furnished passengers in sleeping and parlor cars not enjoyed by coach passengers.

The surcharge was first inaugurated by order of the Director General of Railroads, June 10, 1918, and the collection was made by the carrier's agents and not by the Pullman company. The charge was computed upon the basis of a certain per cent. of the normal one-way fare charged by the carrier.

This order resulted in great inconvenience to the traveling public. It required the passenger to first purchase transportation from the carrier's agent, then purchase sleeping or parlor car accommodations from the Pullman company's agent; and then return to the carrier's agent and purchase a surcharge ticket. Upon complaint, an order was entered by the Director General on December 1, 1918, revoking the right to collect the surcharge.

The railroads were returned to their owners for private operation on March 1, 1920, and, under section 15A of the interstate commerce act, they made application to the Interstate Commerce Commission in April and May, 1920, for authority to increase passenger fares, freight rates and other charges, to meet increased operating expenses, and to enable them to earn a net operating annual income equal, as near as may be, to six per cent. upon the aggregate value of the railway property of the carriers used in their transportation service.

After a thorough investigation and mature consideration, the Commission, on July 29, 1920, authorized an increase of twenty per cent. in passenger fares, thus fixing the basic passenger fare at three and six-tenths cents per mile; and authorized a "surcharge upon

passengers in sleeping and parlor cars amounting to fifty per cent. of the charge for space in such cars," such charge to be collected by the Pullman company along with its charge for space, and "to accrue to the rail carriers." *Ex Parte 74, Increased Rates, 1920,* 58 I. C. C. 220. These charges became effective August 26, 1920, except as to intrastate traffic within certain States, whose commissions were reluctant to make them apply to such traffic.

Section 15A of the interstate commerce act provides "that during two years beginning March 1, 1920, the Commission shall take as such fair return a sum equal to five and one-half per centum of such aggregate value, but may, in its discretion, add thereto a sum not exceeding one-half of one per centum of such aggregate value to make provision in whole or in part for improvements, betterments or equipment, which, according to the accounting system prescribed by the Commission, are chargeable to capital account."

At the time the proceeding in the instant case was instituted the surcharge on interstate travel was effective throughout the United States and in effect on intrastate travel in all the States except North Carolina and West Virginia. As will appear later, it is now effective in North Carolina.

The surcharge, intrastate, was put into effect in a majority of the States by their public service commissions. In Alabama, Arizona, Georgia, Illinois, Iowa, Louisiana, Michigan, Montana, Nevada, North Dakota, New York, Ohio, Oklahoma, Texas and Wisconsin, the State commissions denied the applications of the carriers for authority to make effective the intrastate surcharge and the same was established by orders of the Interstate Commerce Commission.

The surcharge, intrastate, was effective in North Carolina for more than two years, but was abolished

by an act of its General Assembly on March 19, 1923. The carriers thereupon filed a petition with the Interstate Commerce Commission for relief and on October 6, 1925, the Commission re-established the surcharge by authorizing the carriers to collect the same surcharge on intrastate that they were receiving from interstate commerce in North Carolina. *Ex Parte No. 14789, Surcharge for Transportation of Passengers in Sleeping or Parlor Cars between Points in the State of North Carolina, 1925,* 102 I. C. C., p. 537.

In 1922, the Interstate Commerce Commission again reviewed the railroad rates, freight and passenger, including the surcharge, with a view of ascertaining whether the level of rates in force would insure the carriers the return which they were entitled to receive under the provisions of the statute. *Docket No. 13293, Reduced Rates, 1922,* 68 I. C. C. 676. On May 16, 1922, they handed down an opinion in that case in which they refused to reduce the passenger fares or to annul the surcharge as a part thereof, and ordered that the same be continued. The order also fixed five and three-quarters per cent. of the aggregate value of railway property of carriers as a fair return thereon, on and after March 1, 1922.

The proceeding in the instant case was instituted on April 22, 1924, by the Virginia Corporation Commission issuing a rule against all the rail carriers and the Pullman company, to show cause why the surcharge, intrastate, should not be removed in the State of Virginia.

There were then pending before the Interstate Commerce Commission two cases involving the validity of the surcharge. One, *Docket No. 14785, In the Matter of Charges for Passengers Traveling in Sleeping and Parlor Cars,* 95 I. C. C. 469, which involved a

general investigation touching the surcharge, and the other, *Docket No. 14789*, 102 I. C. C. 537, *supra*, involving the surcharge, intrastate, in North Carolina.

In view of the pendency of these two cases, the Virginia Commission continued the instant case from May 9, 1924, to July 15, 1924, "in the hope that there might be a final determination of the matter by the Interstate Commerce Commission." At the opening of the hearing, the chairman of the Commission stated that the Commission had contemplated "for a long time the entry of an order abolishing the surcharge," and without the introduction of any evidence for the Commonwealth but after the introduction of much evidence on behalf of the railroads, on August 1, 1924, the order now complained of was entered.

On January 25, 1925, the Interstate Commerce Commission decided, under *Docket No. 14785, General Surcharge*, 95 I. C. C. 469, *supra*, that the passenger surcharge accruing to the carriers was not unjust or unreasonable, and authorized them to continue to collect the same.

Paragraphs 3 and 4 of section 13 and section 15A of the interstate commerce act, as enacted in sections 416 and 422, respectively, of the transportation act of 1920, provide that whenever in any investigation there shall be brought in issue any rate, fare, charge or regulation imposed by authority of any State; and after such investigation and hearing the Commission finds that such rate, fare, charge or regulation causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, "which is hereby forbidden and

declared to be unlawful," it shall prescribe the rate, fare, or charge, or the maximum or minimum or maximum and minimum thereafter to be charged, as in its judgment will remove such advantage, preference, prejudice or discrimination.

In the *North Carolina Case*, the State legislature had abolished the surcharge on intrastate travel within North Carolina. On October 6, 1925, the Interstate Commerce Commission, after investigation and hearing, held, under *Docket No. 14789, supra*, "that the surcharges made by respondent steam railroads upon passengers in sleeping and parlor cars result in reasonable charges upon passengers so traveling in interstate commerce, and that the failure of respondents * * * to make corresponding surcharges upon passengers so traveling in intrastate commerce within the State of North Carolina has resulted and will result in intrastate charges lower than the corresponding interstate charges, in undue preference and advantage to passengers so traveling in intrastate commerce, and undue prejudice to persons traveling in interstate commerce between points within the State of North Carolina, and between points in the State of North Carolina and points in other States, and in unjust discrimination against interstate commerce. * * * That the undue prejudice and preference and unjust discrimination can and should be removed by making surcharges upon passengers so traveling in intrastate commerce which shall correspond with the surcharges now in effect upon passengers so traveling in interstate commerce." An order was entered making these findings effective.

There are sixteen assignments of error, but it will not be necessary to consider them *seriatim*.

It is contended by the carriers that the order is

arbitrary and contrary to the law and the evidence and without evidence to support it.

The surcharge was first imposed during the world war to meet an emergency, and the people generally feel that it ought to have been abolished soon after the war ended. Its continued existence makes the present Pullman surcharge very unpopular.

[2] The Attorney General contends that the surcharge is an additional tax which the Pullman company is permitted to exact from the people, without giving anything of value in return therefor; but such is not the case. The Pullman company furnishes its patrons with service similar to hotel accommodations, such as a special chair, a compartment, a berth, a lavatory with its accessories, and, generally, with meals if desired. It is permitted to make a charge sufficient to compensate it for these services and pay a reasonable return upon its investment. It does not furnish transportation, but collects the surcharge for the rail carriers, as a part of the latter's charge for transportation. The basic passenger fare is three and six-tenths cents per mile and the surcharge, equal to fifty per cent. of the Pullman charge for space occupied, making the amount paid to the rail carrier by the Pullman passenger about three and ninety-six-hundredths cents per mile. The real question involved is, shall the *carriers* be allowed to charge Pullman passengers a rate per mile in excess of the rate charged coach passengers?

[3] It appears, without contradiction, that the cost of transportation service for Pullman passengers is in excess of such cost for coach passengers; that the average sleeping car will accommodate twenty-seven passengers, the average parlor car thirty-one passengers and the average coach sixty-nine passengers; that taking travel throughout the country, a sleeping or

parlor car will average 12.96 revenue passengers, while a coach in the eastern territory will average twenty-six such passengers; that the deadweight haul of a coach with an average of twenty-six passengers is 3,846 pounds per passenger as against a deadweight haul of 11,574 pounds per passenger on an average occupancy of 12.96 passengers on a Pullman car.

For the convenience of Pullman passengers, the carriers park the Pullman cars at terminal stations before the time for their departure and after their arrival; thereby increasing their switching expenses and appropriating the tracks to the use of sleeping cars to the exclusion of the coach and freight traffic.

We find no merit in the contention of the Commonwealth that the Virginia Commission properly removed the surcharge because the Pullman company is under a contract with the railroads to pay them for hauling the Pullman cars.

In the *General Surcharge Case,* 95 I. C. C. 476, the Interstate Commerce Commission, after a full investigation of the surcharge, found that even when the surcharge collections are added to the contract receipts from the Pullman company, the earnings of the railroads "per car-mile were less from the Pullman travel than from the coach travel." At page 473 the Commission says: "It is certain that the average weight of Pullman cars is considerably greater than that of coaches. It is also certain that the maximum number of passengers which Pullman cars are designed to carry, and the average number which they do carry, are materially less than in the case of coaches. So far as the revenue per car-mile is concerned the evidence is uncontradicted that, *even with the existing surcharge, respondents are receiving less from the Pullman service than from the coach service.*" (Italics supplied.)

Referring to the services rendered by the carriers in handling Pullman cars which are not required in handling coaches, the Commission, at page 473 of the same case, says: "Other things mentioned by respondents as resulting in higher operating costs in the case of Pullman traffic are extra switching incident to parking sleeping cars at stations for occupancy by passengers prior to train departures or subsequent to train arrivals; added use of passenger terminals by reason of such parking and the necessity of keeping available different classes of Pullman cars to meet varying demands; extra switching of Pullman cars at junction points in connection with through travel and also at terminals in making up trains; greater deadheading of equipment; furnishing and hauling of club cars, observation cars, and other special accommodations without charge for space therein; and greater use of the telephone and telegraph service in arranging accommodations."

[4] In 95 I. C. C. at page 478, we find this: "The surcharge, it should be said, ought not to be regarded as an independent third charge upon the passenger. It was devised as a simple and convenient method for computing an addition to the basic passenger fare for those who ride in Pullman cars, and is thus equivalent to an increase in the rate per mile. Where the basic fare is three and six-tenths cents per mile, the surcharge adds ten per cent. and brings the fare up to about three and ninety-six hundredths cents per mile. The Pullman passenger pays to the rail carrier, on the average, less than four cents per mile as against the three and six-tenths cents paid by the passenger in the coach. * * * The principle is not different when, in effect, one and one-tenth passenger fares are collected from the passenger who has the reserved right to

exclusive use of a designated arm chair in a parlor car or a designated double seat and a berth in a sleeping car. The rail carrier undertakes to do and does more for him than it does for the passenger in a day coach and the difference in the value of the service abundantly justifies the difference of one-tenth in fare. Whether this tenth be collected in the form of a surcharge, computed on the Pullman charge but accruing to the rail carrier, as at present, or whether it take the form of an extra ticket, representing the same one-tenth, or of a special ticket representing one and one-tenth fares, is immaterial as bearing upon the reasonableness of the charge in essence.''

[5] If the State commissioners are allowed to reduce intrastate fares below the general level of the interstate rates, the result will be to break down the interstate rates established by Federal authority. In *North Carolina Fares and Charges*, 60 I. C. C. 362, in the *South Carolina Case*, 60 I. C. C. 290, in the *New York Case*, 59 I. C. C. 290, and in the *Illinois Case*, 59 I. C. C. 350, the Interstate Commerce Commission found that the direct effect of lowering the intrastate fares was to disrupt the interstate system of fares; that there was "a growing practice among passengers traveling on an interstate journey to purchase intrastate tickets to or from border points in the State with the lower intrastate fare, and then purchase tickets at the interstate rate to points beyond the border." To illustrate: A passenger from New York to Chicago could avoid the payment of the established through interstate rate by purchasing a ticket at the intrastate rate from New York to Buffalo, and then buy another ticket from Buffalo to Chicago at the interstate rate. The inevitable result was a material interference with interstate commerce, "by reducing the earnings of inter-

state carriers on what would otherwise be interstate traffic."

In the *North Carolina Case*, 60 I. C. C., at page 365, the Commission said: "The record contains many illustrations of the way in which the North Carolina intrastate fares have the effect of reducing the earnings on interstate traffic, or rather on what would be interstate traffic if it were not for the difference in fares. Travelers going to or coming from points outside of the State find it cheaper to pay the intrastate fare within North Carolina and the interstate fare beyond the border than to pay the through interstate fare. * * * Experience has shown that, whatever the condition which creates it, a lower level of fares intrastate than interstate cannot be maintained, and ultimately the interstate fares must be reduced to the level of the intrastate fares. Moreover, it will be difficult, if not impossible, to maintain a lower level of fares in North Carolina and at the same time maintain the present intrastate basis of three and six-tenths cents per mile in other States of the Southern group, some of which adjoin North Carolina."

[6] The transportation act of 1920 does not give to the Interstate Commerce Commission the power to regulate intrastate commerce generally, but only in so far as may be necessary, under the paramount power of Congress, efficiently to regulate interstate commerce.

The State authorities still have the power to deal with intrastate rates, "on the general level which the Interstate Commerce Commission has found to be fair to interstate commerce." *Wisconsin Case*, 257 U. S. 384, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086.

[7] There is no merit in the contention that the surcharge should be removed because two of the rail-

roads in Virginia were earning a return in excess of that fixed by the Interstate Commerce Commission. The act provides that the excess return in such cases is subject to a *pro rata* re-capture for the *pro rata* benefit of all the roads of the same rate group.

[8] Nor is there merit in the contention that the surcharge should be removed because the loss occasioned thereby would be *de minimis.* It is not denied that the surcharge, intrastate, is worth to the carriers in Virginia $100,000 a year. In the *Alabama Case* the Interstate Commerce Commission ordered the surcharge restored where the estimated annual loss, intrastate alone, was less than $50,000; and likewise in the *North Carolina Case,* where the direct loss on intrastate traffic was about $75,000 a year.

The case of *Atlantic Coast Line R. Co.* v. *Commonwealth,* 136 Va. 134, 118 S. E. 257, relied on by the Commonwealth, is not in point. That case involved the action of the Virginia Commission in promulgating rules to govern demurrage, storage and car service charges on intrastate traffic in Virginia. The court sustained the validity of the rules on the ground that the Interstate Commerce Commission had never occupied this field of its jurisdiction, and held that until it does these State regulations are binding.

We are of the opinion that the case at bar is controlled by the *Alabama Case,* 62 I. C. C. 155; the *Georgia Case,* 69 I. C. C. 623; and the *North Carolina Case,* 102 I. C. C. 537.

In the *Alabama Case,* the Interstate Commerce Commission ordered the surcharge restored after the Alabama Public Service Commission had undertaken to deny the right of the rail carriers to collect it. At page 155 the Commission said: "Another source of financial loss to respondents is the ability of interstate

travelers to avoid full payment of the surcharge on a through journey by paying combinations of local Pullman fares to and from border-line points. In this way a passenger from Louisville, Ky., to Mobile can reduce his through transportation charge from $26.32 to $24.94 by paying combination Pullman fares to and from Decatur, Ala."

In the *Georgia Case*, the Interstate Commerce Commission ordered the surcharge restored after the State Commission had removed it. In the opinion, at page 623, we find this: "Another source of financial loss to respondents is the ability of interstate travelers to avoid full payment of the surcharge on a through journey by paying combinations of local sleeping or parlor car fares to and from border-line points. In this way a passenger from Chattanooga, Tenn., to Augusta, Ga., can reduce his total transportation charge from $12.35 to $11.35 by paying combination fares to and from Dalton, Ga. This instance is typical of many others cited in the record. Interstate passengers indulge constantly in the practice, thus defeating through interstate charges."

We have already discussed the *North Carolina Case*, *supra*.

[9] The Interstate Commerce Commission, acting under the paramount authority of Congress, occupies the entire field in all matters pertaining to interstate commerce and has thereby ousted the jurisdiction of the State authorities where they undertake by legislation or regulation to control interstate transportation in a manner which results in an unjust or unreasonable discrimination against interstate commerce. *Wisconsin v. C. B. & Q. R. Co.*, 257 U. S. 563, 42 Sup. Ct. 237, 66 L. Ed. 371, 22 A. L. R. 1086.

[10] In the case last cited, 42 Sup. Ct. p. 237 (257

U. S. 588), the court says: "It is objected here, as it was in the *Shreveport Case*, that orders of the Commission which raise intrastate rates to a level of the interstate structure, violate the specific proviso of the original interstate commerce act repeated in the amending act, that the Commission is not to regulate traffic wholly within a State. To this, the same answer must be made as was made in the *Shreveport Case*, 234 U. S. 342, 358, 34 Sup. Ct. 833, 58 L. Ed. 1341, that such orders as to intrastate traffic are merely incidental to the regulation of interstate commerce and necessary to its efficiency. Effective control of the one must embrace some control over the other in view of the blending of both in actual operation. The same rails and the same cars carry both. The same men conduct them. Commerce is a unit and does not regard State lines, and while, under the Constitution, interstate and intrastate commerce are ordinarily subject to regulation by different sovereignties, yet when they are so mingled together that the supreme authority, the Nation, cannot exercise complete effective control over interstate commerce without incidental regulation of intrastate commerce, such incidental regulation is not an invasion of State authority or a violation of the proviso."

[11] The Commonwealth offered no evidence, and the record failing to disclose any evidence on behalf of the carriers which supports the action of the Virginia Commission, its order eliminating the surcharge and thereby depriving the carriers of $100,000 per year is the taking of property without due process and is void.

In *Northern Pacific Railway Co.* v. *Department of Public Works of Washington*, 268 U. S. 39, 45 S. Ct. 412, Advance Op., May 1, 1925, p. 485, 69 Law Ed.

836, Mr. Justice Brandeis, speaking for the court, said: "An order based upon a finding made without evidence * * * or upon a finding made upon evidence which clearly does not support it * * * is an arbitrary act against which courts afford relief. The error under discussion was of this character. It was a denial of due process."

For the foregoing reasons, we will enter an order here reversing and annulling the order of the Virginia State Corporation Commission removing the surcharge, and authorizing the appellant corporations to cancel the coupons which have been given by the carriers as tokens of the surcharges paid on the terms of the supersedeas bonds, and directing that said bonds be cancelled and the sureties thereon be discharged from liability; and further authorizing the carriers to collect the same Pullman surcharges intrastate as they are now collecting on interstate transportation in Virginia.

*Reversed.*